RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 12a0357p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT
_____

ROY BLACKMON,

          *Petitioner-Appellee*,

      *v.*

RAYMOND BOOKER, Warden,

          *Respondent-Appellant.*

No. 11-1038

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 03-71206—Arthur J. Tarnow, District Judge.

Argued: March 6, 2012

Decided and Filed: October 9, 2012

Before: MARTIN, SUTTON and BALDOCK,[*] Circuit Judges.

_____

## COUNSEL

**ARGUED:** Bruce H. Edwards, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Bradley R. Hall, FEDERAL DEFENDER OFFICE, Detroit, Michigan, for Appellee. **ON BRIEF:** Laura Moody, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Bradley R. Hall, FEDERAL DEFENDER OFFICE, Detroit, Michigan, for Appellee.

_____

## OPINION

_____

BALDOCK, Circuit Judge. A 1998 neighborhood shooting in Detroit, Michigan resulted in the death of an eighteen year old male bystander, Kenneth Tinsley, and injury to two other bystanders, a twenty-one year old male, Michael Hearn, and a nine year old

---

[*] The Honorable Bobby R. Baldock, Circuit Judge for the United States Court of Appeals for the Tenth Circuit, sitting by designation.

1

female, Tiffany Smith.  A year later, a Michigan state court jury found then twenty-two year old Petitioner Roy Blackmon responsible and convicted him of second-degree murder, using a firearm during the commission of a felony, and two assaults with intent to do great bodily harm.  The state court sentenced Petitioner to between forty and sixty years imprisonment on the murder count, concurrent three to ten year terms on the assault counts, and a consecutive two year term on the firearm count.  Eleven years of legal wrangling later, a federal district court on collateral review pursuant to 28 U.S.C. § 2254 held Michigan had deprived Petitioner of his right to a fair trial in violation of the Fourteenth Amendment's Due Process Clause.  *Blackmon v. Booker*, 762 F. Supp. 2d 1031 (E.D. Mich. 2010).  The district court granted Petitioner a conditional writ of habeas corpus and told Michigan to retry him.  The State appealed pursuant to § 2253(a). The issue, as framed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), is:  Whether the Michigan Court of Appeals holding—namely, that the state prosecution's (1) elicitation of, and (2) comment upon, testimony regarding Petitioner's gang affiliation did *not* render his trial so unfair as to result in a denial of federal due process—"resulted in a decision that . . . involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  The district court thought so; we do not. Because the district court's decision plainly exceeds the limitations that § 2254(d)(1) imposes on federal habeas review, we reverse.

I.

On habeas review pursuant to § 2254, a "court faced with a record of historical facts that supports conflicting inferences [and *a fortiori* findings] must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  *McDaniel v. Brown*, 130 S. Ct. 665, 673 (2010) (internal quotations omitted).  Accordingly, in Part I.A. we summarize the record evidence in a light most favorable to the State, accounting, of course, for the gang-related testimony on which Petitioner bases his claims of unconstitutional prejudice.  With that evidence in hand, we next recite in Part I.B. the

challenged portions of the prosecution's opening and closing statements within the context of the defense's own statements to the jury.   In Part II we trace the case's procedural history.   Finally in Part III of our opinion, we assess Petitioner's claims under the deferential AEDPA standard.  That standard requires Petitioner to show "the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing [Supreme Court precedent] beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 131 S. Ct. 770, 786–87 (2011).

A.

During the early evening hours of Easter Sunday, April 12, 1998, while still daylight, twenty-one year old Duane Harris, also known as Jimmy Crost (Crost), stopped by to visit twenty year old Nancy Ellis at her house on Woodmont Street in Detroit. Nancy, her twenty-one year old sister Adrienne Ellis, and their cousin Tiffany Coggans (presumably of similar age) were inside the house.  Crost, accompanied by his two year old daughter, parked the Grand Prix he was driving in the driveway.  Nancy described Crost and Petitioner as friends.  Nancy also described Crost and herself as friends.  But twenty-two year old Autumn Taylor, Adrienne's best friend, knew Crost and Nancy as "more than friends." Appellant's Appendix (Aplt's App.) at 506.  Adrienne said "I guess they kick it." *Id.* at 559.  Nancy testified she had "just broken up" with Kenyatta Simons "like a week before." *Id.* at 410.  Simons testified, however, that he had been going out with Nancy since "like ninth grade" and was "still going out with" Nancy "at the time." *Id.* at 600–01.

Simons, who lived down the street from Nancy, showed up at her house moments after Crost arrived.  Nancy met Simons outside near the porch steps.  Crost stood in the front door where Simons could see him.  Adrienne testified Simons "push[ed] [her] sister's face." *Id.* at 562.  Nancy testified Simons told her to tell Cross that when he "come outside he getting bust at, meaning shot at." *Id.* at 415.  Crost testified he heard Simons say "when he come out the house, tell him I'm going to pop him." *Id.* at 665.

At that point, Crost went back inside Nancy's house and upstairs to use the telephone. Nancy listened:

> Q.     When he's on the phone, did you hear him talking to someone on the other end?
> A.     Yes.
> Q.     Did you hear what he said?
> A.     Come and get me, I'm on Woodmont.
>
> ***
>
> Q.     Was he angry when he was on the phone?
> A.     No.  Probably a little scared, not angry.
> Q.     Scared.  Okay.  Did he say anything or indicate anything about having problems on Woodmont?
> A.     He could have.  I don't remember.  That was a year ago.
> Q.     He could have.  That's something you might have heard?
> A.     Yeah, he could have said it.
> Q.     So not just pick me up, I'm having some problems on Woodmont, the street you're on, right?
> A.     Right.

*Id.* at 417–18.

The record suggests Nancy was not particularly forthcoming in her trial testimony.  She admitted she did not "want to involve [herself] . . . in this matter at all." *Id.* at 441.  Nancy testified that shortly after Crost hung up the phone, a burgundy Impala stopped on Woodmont Street near the end of the driveway south of her house.  Nancy said she saw no one get in or out of the vehicle.  But she did see Crost walk toward the vehicle.  At the same time, she saw a person wearing a red shirt approach Crost.  Nancy then heard five gunshots in rapid succession, but testified she did not see the shooter.[1] Nancy acknowledged that shortly thereafter someone phoned her about the shooting, but testified "I'm not sure who." *Id.* at 427.  When asked if Crost was a member of a gang known as the Schoolcraft Boys, Nancy stated she was "not sure," but "[h]e hang around them." *Id.* at 438.

---

[1]Investigating Officer Marlise Ann Harowski testified that following the shooting she observed "five spent casings" in the "middle of the street" one house south of Nancy's residence.  Aplt's App. at 651–52.

During her testimony, the prosecution presented Nancy with three signed statements she gave to police investigators following the shooting. Nancy testified that each of those statements were true. *See id*. at 434, 436–37. She told investigators:

- Crost informed whomever he was speaking to on the phone that "he was having some problems on Woodmont." *Id.* at 428.

- She "saw a guy in a red shirt get out of the passenger's side of the car" and walk toward Crost. *Id.* at 430.

- After the shooting, "Roy called and told [her] if anyone asked who he was, that [she] didn't know who he was. [She] asked him if he knew he shot three people and a little girl and he didn't say anything except you don't know me." *Id.* at 432.

- Crost had been a member of the Schoolcraft Gang "[s]ince [she] known him, a couple of years." *Id.* at 439.

Nancy's sister Adrienne was by record appearance an even more difficult witness. Adrienne testified she was on the front porch when she too heard Simons threaten to shoot Crost. Adrienne saw an Impala pull into the alley south of the house moments later. Crost was "running or walking towards the car" with his daughter. *Id.* at 543. Adrienne then saw a black male wearing a red shirt and wielding a gun get out of the passenger's side of the car. She described the man's hair as "nappy," *i.e.*, tightly curled. *Id.* at 553. When Adrienne saw the man "pull the gun up" and heard shots, she ran inside and phoned the police. *Id.* at 546. When asked if she had "seen the shooter before," she replied "[h]e looked familiar but —." *Id.* Like her response to many of the prosecution's questions, Adrienne answered "I don't recall" when asked whether Nancy or their cousin Tiffany Coggans said anything about "seeing the shooter." *Id.* at 548–49. In a prior statement to investigators, Adrienne indicated she had seen the shooter and "[h]is first name is Roy, I don't know his last name." *Id.* at 558. On cross-examination, Adrienne said she lied and identified "Roy" as the gunman only after police told her she would not be allowed to go home, but would be charged as an accessory to murder, if she did not say "Roy did it." *Id.* at 573. On redirect examination, the prosecution inquired:

> Q.    So if you're lying to the police, then you['re] basically pinning a murder on someone named Roy Blackmon, this being the person right here as you described?
>
> A.    Yeah.
>
> Q.    You have no problem with that and walking into the police station and pinning someone for a murder?
>
> A.    I did have a problem with that. That's why I asked [the investigator] to give me police custody [sic] because she had me saying somebody did it who didn't. . . . I don't know if they did it or not.

*Id.* at 588.

Tiffany Coggans testified she was "[i]n the back room" of Nancy's house during the course of events and, other than hearing gunshots, had no knowledge of what occurred. *Id.* at 480. Coggans responded no when asked whether Nancy or Adrienne had identified the shooter to her. The prosecution impeached Coggans with her previous statements to investigators that (1) Adrienne said "a guy named Roy pulled a gun and started shooting," and (2) Nancy said "she didn't think they were going to do anything because Jimmy had his daughter." *Id.* at 490, 492. The trial court instructed the jury to consider Coggans' prior statements only for the purpose of assessing her credibility.

Adrienne's friend Autumn Taylor testified she was on her way to visit Adrienne when the shooting occurred. Taylor was near the end of the house's walkway when she heard the gunfire. "[A] whole street full of people" was nearby. *Id.* at 508. Taylor crawled from the end of the sidewalk onto the porch, and into the house with Nancy and Adrienne. Taylor testified that Nancy had not identified the gunman to her. In her statement to investigators, however, she indicated Nancy "identified the actual shooter." *Id.* at 513.

Michael Hearn, a victim of the shooting, "lived down the street" from Nancy. *Id.* at 186. Although under subpoena, Hearn expressed a willingness to testify. Hearn testified he knew both Crost and Petitioner from the nearby "Grand River, Greenfield" neighborhood, or what Hearn also referred to as the "Schoolcraft Greenfield area." *Id.* at 181–82. Over defense counsel's continuing objection, Hearn testified to Petitioner's gang affiliation:

> Q.     Are you aware of a gang by the name of Schoolcraft Boys?
> A.     Oh yeah, I'm aware of a gang named Schoolcraft.
> Q.     Are you aware of members of the Schoolcraft Boys?
> A.     Yes.
>
> \*\*\*
>
> Q.     Are you aware of . . . those gang members in the neighborhood if you saw those persons?
> A.     Yeah, basically, I would know a few.
> Q.     Do you see any of them in the courtroom today? Remember you're under oath.
> A.     Yeah, I see one in front of me.

*Id.* at 183–84.  Hearn identified that "one" as "[h]im, Roy."  *Id.* at 256.

Describing the events of April 12, 1998, Hearn testified that moments prior to the shooting "a whole bunch of people [was] out in the street" three or four houses from where Nancy lived on Woodmont.  *Id.* at 193.  Hearn's friend Kenyatta Simons stood a few feet further down the street.  Hearn described the houses as "close together."  *Id.* at 201.  Hearn testified he saw a burgundy Impala pull up in front of Nancy's driveway and Crost come out of her house.  Hearn further testified he saw Petitioner get out of the passenger's side of the Impala.  The Impala then "backed in the alley."  *Id.* at 198.  Hearn described Petitioner as wearing a red shirt and a red hat with "little braids hanging out his hat."  *Id.* at 196.  Hearn testified to what happened next:

> Q.     When Mr. Blackmon came out of the car, where did he go?
> A.     He like stood . . . in front of Nancy's house, and like Jimmy came out the house and they had said—like a word or two.
>
> \*\*\*
>
> Q.     How long did they converse?
> A.     Maybe a few seconds or so.
>
> \*\*\*
>
> Q.     Was there anybody else . . . around them?
> A.     No.
> Q.     Did Mr. Blackmon ever look in your direction?
> A.     Yeah, they both looked down the street.
>
> \*\*\*
>
> Q.     After they conversed with each other and look at you, what happens then?
> A.     Jimmy began to walk away.
> Q.     Jimmy Crost?

> A.    Began to walk away towards the alley.
>
> ***
>
> Q.    That's where the car was at?
> A.    Right
> Q.    Okay.  Was the car still there?
> A.    Yeah.  This happened like all in one motion.
> Q.    Okay.
> A.    And Roy turned and started shooting.

*Id.* at 200-01.  Hearn estimated he was standing about a thirty-second walk or thirty-five feet from Petitioner, but was "able to still see him clearly."  *Id.* at 202.  Meanwhile, Kenneth Tinsley, who was fatally wounded in the shooting, stood about four feet from Hearn "in the line of fire."  *Id.* at 210.  According to Hearn, Simons also stood where he might "have been struck by bullets."  *Id.* at 215.  Hearn testified Petitioner fired "six to eight" shots.  *Id.* at 203.  One shot struck Hearn in the right bicep and a second struck him in the neck behind the left ear.  After stumbling a few steps, Hearn collapsed.

Another shot struck nine year old Tiffany Smith in the hip while she was riding her bicycle in front of her house.  Tiffany testified "I fell off my bike and my mama dragged me up the steps."  *Id.* at 379.  She said she heard shots coming from both the alley and the street, but did not see anyone actually shooting a gun.  Tiffany further testified that some time after the shooting someone marked the slide on the playground at her school with "a whole bunch of writing . . . and it had R.I.P. Tiffany on the slide, . . . an[d] then it had the Schoolcraft gang at the bottom."  *Id.* at 383.

> Q.    You said there's writing on the slide?
> A.    Yes.
> Q.    R.I.P., what does that mean to you?
> A.    Rest in peace.
> Q.    And it had your name on it?
> A.    Yes.
> Q.    You scared when you saw your name?
> A.    A little.

*Id.* at 384.

Nineteen year old Arthur Anderson lived "[t]hree or four houses down" from Nancy. *Id.* at 301. Anderson indicated he was friends with the two male victims, Michael Hearn and Kenneth Tinsley. Anderson also stated he had known Jimmy Crost and Petitioner since high school. He identified both Crost and Petitioner as members of the Schoolcraft Boys and stated their gang membership made him fearful of testifying:

> Q.    [I]s Mr. Blackmon a member of that group?
> A.    Yes.
> Q.    Mr. Crost is a member of that group?
> A.    Yes.
> Q.    . . . . Does that fact that they are a part and members of that gang, does that give you fear or intimidation about testifying? . . .
> A.    Yes.

*Id.* at 293. In fact, the court had ordered Anderson detained pending trial because he earlier failed to appear for a related court hearing:

> Q.    Did you want to come to court on this matter?
> A.    No.
> Q.    Why not?
> A.    Because–you know what I'm saying.
> Q.    No you're going to have to tell me, I'm sorry.
> A.    I feared for my life.
> Q.    From these officers?
> A.    Huh?
> Q.    From the officers?
> A.    You know what I'm saying, I didn't want to put myself in this situation.
> Q.    Involving the officers or the person that you saw do the shooting?
> A.    All of it.
> Q.    All of it?
> A.    You know what I'm saying, I just didn't want to be with this.
> Q.    Okay. You understand you actually saw the shooting?
> A.    Yeah, I saw the shooting.

*Id.* at 287–88.

Anderson testified he had just come out the front door of his house on Woodmont Street when he heard gunshots. Anderson looked towards Nancy Ellis's house in the

direction of the shots.  He did not see Crost or the Impala, but did see Petitioner wearing a red hat:

    Q.    Did you see anything in Mr. Blackmon's hands?
    A.    Yes.
    Q.    What did you see?
    A.    A gun, I saw him pointing a gun.
                  ***
    Q.    [C]ould you see him actually firing it?
    A.    Yes.
                  ***
    Q.    Was he pointing the gun at all towards you or was it just being pointed down toward the street?
    A.    It was pointed towards the people that was . . . out in front of [my] house.
                  ***
    Q.    [W]hat people were out in front of your house?
    A.    The people I saw out there was Kenyatta and like three other guys.

*Id.* at 299–302.  After identifying Petitioner as the shooter, Anderson again expressed his reluctance to testify:

    Q.    And you're telling me you're not scared of testifying?
    A.    It could be, you know what I'm saying, dangerous . . . .
                  ***
    Q.    [W]ho exactly [are] . . . you scared of retaliation from?
    A.    It could be—they could want to do something.  You never know.
    Q.    Who's they?
    A.    The Schoolcraft gang.  You never know.
                  ***
    Q.    The gang that Mr. Blackmon's a member of?
    A.    Yeah.

*Id.* at 356–59.

The prosecution called Kenyatta Simons as its final witness.  Simons admitted seeing Crost at Nancy's house shortly before the shooting, but denied threatening him.  Contrary to his prior statement to investigators, Simons also denied confronting Nancy about the situation.  Simons testified he was standing on the sidewalk talking to Michael

Hearn and others when he saw a "dark-skinned" man wearing "a bunch of red," including a red hat, "in front of [Nancy's] house." *Id.* at 605–06, 622.

> Q.    [W]hat did [the man] do?
> A.    Just stopped in front of [Nancy's] house and then the other dude walked up.
> Q.    What other dude walked out?
> A.    Jimmy.  Yeah, it was Jimmy.
> Q.    The guy from the house?
> A.    Yeah, from the house.
> 　　　　　　　　　　　　***
> Q.    Did he meet up with that other person in the red?
> A.    Yeah, they met on the sidewalk.
> 　　　　　　　　　　　　***
> Q.    They looked at you?
> A.    No, they was looking down in our direction, that's all.
> Q.    . . . . So you were with Michael Hearn?
> A.    Yes.
> 　　　　　　　　　　　　***
> Q.    And other people?
> A.    Yes.
> 　　　　　　　　　　　　***
> Q.    Where did Jimmy go after they talked?
> A.    They talking, they was shooting then.
> Q.    You said they were shooting?
> A     Not they were shooting but it was a shooter in the red.

*Id.* at 607–09.

Crost and Petitioner testified on behalf of the latter's defense.  Crost stated he was friends with Nancy Ellis and Petitioner, and acknowledged being at Nancy's house shortly before the shooting.  Crost witnessed an argument between Nancy and Simons and heard Simons threaten to shoot him.  Crost denied taking Simons' threat seriously or calling anyone on the phone for assistance.  Rather, Crost testified he did not want to become involved so he decided to leave.  As he was stepping off the porch, he heard shots coming from "[d]own towards Kenyatta's and them house, down that way where he had walked from when he first came walking up the street." *Id.* at 681.  Crost ran away with his daughter and never returned to pick up the Grand Prix in which they arrived.  On cross-examination, Crost testified that neither he nor Petitioner were

affiliated with the Schoolcraft Boys.  Petitioner similarly denied any involvement in the April 12, 1998, shooting on Woodmont Street.  He said he was home alone at the time and had no alibi.  Petitioner further denied receiving a phone call from Crost that evening about "some problems on Woodmont," or phoning Nancy following the shooting to tell her "you don't know me."  *Id.* at 428, 432.  Although aware of various gangs in the surrounding areas, he also denied being a member of the Schoolcraft Boys.

B.

Given the fact-intensive nature of Petitioner's claim that the prosecution violated his right to federal due process by eliciting testimony regarding his gang affiliation, and the need to consider the record as a whole, we necessarily have reviewed in some detail the entirety of the inconsistent and conflicting trial testimony.  Given Petitioner's additional claim that the prosecution's characterization of such testimony before the jury similarly violated his right to due process, we now necessarily turn for much the same reasons to a detailed recitation of those germane portions of both the prosecution's and defense's opening and closing statements.

Mindful of the testimony to come, both the prosecution and defense in their opening statements to the jury emphasized witness credibility, and referred to how Petitioner's and Crost's alleged gang affiliation might bear upon the truth.  The prosecution stated:

> And it's going to be interesting, I guarantee you, . . . when we look at the credibility of witnesses how they testify. . . . [I]t's going to become very important and clear to you as we proceed because I anticipate that the witnesses for the prosecution, that being the witnesses that I have to present to you . . . if I put my money on it, are going to change their story. . . .  It's going to be up to you to evaluate their credibility, why they changed their stories, what motivation they had to lie, what motivation do they have to tell the truth, what are their bias[es], what are their prejudices.
>
> ***
>
> See, this isn't just a serious crime.  See this . . . will appear to you to be a little feud.  See, the defendant, Mr. Blackmon, it's alleged through other witnesses which you're going to hear, is a member of the Schoolcraft Boys, Schoolcraft Boys being a local gang that hang around

the area of Schoolcraft Road. And those individuals don't get along too well with the individuals who live on Woodmont, including possibly . . . some of my witnesses.

*Id.* at 158–60. Meanwhile, the defense stated:

And unfortunately all that talk about credibility of the witnesses that we did in the voir dire, that's exactly what this case is going to boil down to.

***

Now, though I tell you . . . that we can't assure you of what people are going to say, I believe I can give you some idea of what went on out there. I don't know anything about a feud. . . . I don't know anything about whether Mr. Blackmon's a Schoolcraft Boy or whatever the Schoolcraft Boys are or whether they don't like people that live on Woodmont, . . . . Maybe somebody's going to say that, and if they do, you can consider it for what it's worth.

Aplt's App. at 168–69.

In its closing statement, the prosecution returned to the topic of witness credibility. The prosecution asked the jury what motivation Michael Hearn and Arthur Anderson, the two witnesses who identified Petitioner as the shooter, would have to lie. But as for a number of the prosecution's other witnesses, "[s]omething is causing these witnesses to hedge." Trial Transcript (Trial Tr.) at 754.[2] To prove its point, the prosecution summarized the possible inferences to be drawn from the testimony of Anderson and Tiffany Smith:

Funny Tiffany Smith . . . goes over to the slide in the school and it says R.I.P. Tiffany Smith, signed Love, the Schoolcraft Boys, . . . . Tiffany Smith, I mean you can gather from her age, is she scared? Yes she's scared. Scared why, because she told her mother[.] This is the intimidation. That's why people are scared of these people. . . . [Y]ou wonder why these people are scared. You wonder why these people don't want to come forward. You wonder why witnesses . . . come in here and are scared to involve themselves in the system, scared to testify.

*Id.* at 768.

---

[2]The State omitted the parties' closing arguments from the appendix it submitted on appeal. In citing portions of those arguments, we therefore rely on the actual state court trial transcript, which circuit and district court clerk staff working in tandem graciously uploaded to the district court docket.

> And Arthur Anderson's under the gun even more because he candidly admitted to you on the stand I'm intimidated. . . .   He knows that the defendant and his buddy, Jimmy Crost or Duane Harris or however you want to know . . . his name . . . , member of these Schoolcraft Boys. Matter of fact, during the testimony he looked around and I asked him do you see any of them, any others in the courtroom?  And he . . . looked right at Mr. Blackmon, if you caught that. . . .   You don't understand what kind of position I'm in he says.  This is not a good thing.

*Id.* at 757–58.

The prosecution also relied on the testimony of Nancy Ellis to suggest a motive for the shooting, *i.e.*, the reason why Petitioner showed up on Woodmont Street and fired into the crowd shortly after Simons threatened Crost:[3]

> Nancy Ellis indicates that . . . Kenyatta Simons makes some type of feeble threat, I'm going to pop you or something of the like, which obviously didn't scare Jimmy Crost, didn't scare him at all, not scared at all.  But he goes to the phone, he uses the phone.  That was Nancy Ellis's testimony, uses the phone and calls one of his people.  Here's that person right here.  Because shortly thereafter, just like a storybook, here come his people and his people come  and . . . back into the alley.
> ***
> Coming over to a house to protect your people, come out there and fire a gun down a public street, a neighborhood, . . . .
> ***
> Schoolcraft Boys and Jimmy and the rest of them and Roy Blackmon aren't going to come there and do what they used to do, beat you up. They come down there firing because that's what cowards do, they fire.

*Id.* at 760–61, 769, 771.

For its part, the defense criticized the prosecution's characterization of many of its own trial witnesses as liars and purveyors of half-truths who falsely claimed "the police picked on them." *Id.* at 782.  If everyone is a liar, the defense asked, why should the jury believe Nancy Ellis's testimony that Crost made a phone call from her house shortly before the shooting when Crost denied the fact?

---

[3]The trial court instructed the jury: "You may consider whether the defendant had a reason to commit the alleged crime, but a reason by itself is not enough to find a person guilty of the crime."  Trial Tr. at 832.

> Do you want to know why? Because it's the prosecutor's job to prove the case beyond a reasonable doubt. And the prosecutor has to have . . . even though he's not required to prove a motive, he wants you to at least think, well, this is the way it happened. Jimmy summoned Roy, because [the prosecutor] knows it makes no sense for Roy Blackmon to be down there shooting people he doesn't know.
> ***
> But Jimmy, . . . because he's a defense witness and because, of course, he's probably the king of the Schoolcraft gang . . . , Jimmy is a liar . . . .

*Id.* at 783–85. Further into its closing statement, the defense again brought the character of its witnesses into focus, criticizing the evidence of Petitioner's and Crost's gang affiliation as nothing more than the prosecution's efforts to portray them as bad apples:

> [The prosecutor] made much of everyone is scared . . . . He's not just telling you that people are scared in general. . . . [T]his case . . . started out as a murder case, . . . but it's really turned into much more than that because now the theme of the case is . . . they're scared of [Petitioner] and the Schoolcraft gang. That's what this is all about.
> ***
> So the theory of this case from the prosecutor's standpoint is, number one, we've got . . . some kind of identification of Roy Blackmon so you ought to convict him of murder for that reason, but really what you ought to convict him for is for being in a gang. Whether he's the president of the gang or he's in the gang, he's in a gang and it's called the Schoolcraft Boys and they're bad.
> ***
> [Because his prosecution] turned into a gang case . . . Mr. Blackmon is being blamed for anything that ever happens on the west side of Detroit because he's Roy Blackmon . . . .

*Id.* at 792–95. The defense did not stop there. The defense subsequently used the word "gangster(s)" no less than one half dozen times and made facetious statements such as:

- "But they're gangsters you see. Duane Harris [*i.e.*, Jimmy Crost] is a gangster." *Id.* at 799.

- "[A]ll this other stuff . . . that [is] meant to make you think Roy Blackmon is bad, this big business about gangs . . . ." *Id.* at 800.

- "Roy Blackmon tells [the prosecutor] I've heard of a number of gangs. [The prosecutor] then . . . tells you that shows what a

gangster he is, that shows you how bad he is because . . . he named off gangs . . . in the neighborhood." *Id.* at 800–01.

- "The guy knows of gangs. Therefore, not only is he a gangster but he's a murderer." *Id.* at 801.

- "He gets up there to defend himself against all these charges, not only that he's the murderer and assaulter with intent to murder but that he's a gangster, even though he's not charged with being a gangster." *Id.* at 804–05.

Thereafter, the prosecution presented its rebuttal statement. The prosecution began by emphasizing its theory of the case:

Nancy Ellis . . . essentially indicates that Jimmy started the whole thing. . . . I am arguing that Jimmy started the whole thing because . . . when he picked up that phone, as Nancy Ellis testified to, that's what brought Mr. Blackmon over to enforce whatever on behalf of his people. This gang stuff, this is nothing I'm making up out of the blue. This is what witnesses indicated. . . . [Defense counsel] knows it's an issue in this case. Absolutely.

\*\*\*

[Y]ou don't throw your common sense out the window when you walk in here. . . . [S]omething is causing a whole lot of fear in these witnesses. Something is causing a whole lot of fear about this man here, Mr. Blackmon. Not just run of the mill stuff, I'm testifying against a shooter, something about the Schoolcraft Boys, which I have nothing to do with, no control over until I get a file and I get a witness. And if you didn't have a witness who indicated that, guess what? It wouldn't be in this case. . . . I'm not pulling this out of the air to pull him down. That is an important part of this case, and I didn't make it a part of this case. Mr. Blackmon did and Mr. Crost did.

\*\*\*

I've shown what took place between Kenyatta [Simons] and Jimmy [Crost] and there's the motive. Having problems over here on Woodmont, send your boys—send some boys out, send some of my gang, my group.[4]

_____

[4] When during the prosecution's case-in-chief, the defense objected to the admission of testimony relating to Petitioner's gang membership on the basis of relevancy and undue prejudice, the prosecution made the same argument to the court:

I see it as relevant because, again, it goes to the whole circumstances. That there's an argument, someone says—makes a threat to one person, that person says fine, and then according to our theory, calls the so-called muscle to come over there and then at this point this whole shooting takes place. . . . I think it's relevant for those purposes, that here an individual uses his, quote, muscle. I think it's a part of the theme of this case

*Id.* at 807–11.  The prosecution next attacked Petitioner's testimony that he was not a member of the Schoolcraft Boys or any other gang:

> I hope nobody expected him to say I'm a gang member because that's not going to happen.  It's a beautiful defense in the sense that there's nothing else I can go into with him. . . .  [Y]ou don't throw your common sense out the door when you're sitting here in that chair and all these people are identifying you and you're laughing about it.  Why?  Because you're going to take care of business later.  Obviously you didn't scare these witnesses enough.  You should have wrote tombstones on their front doors.

*Id.* at 812.  The prosecution concluded:  "Jimmy Crost . . . started the whole progression of what happened.  [Defense counsel] can ignore, argue it doesn't happen on behalf of his client.  I don't know anything about this gang stuff and I can be naive.  That's in this case.  That's what this case is about."  *Id.* at 816.

## II.

On direct appeal, Petitioner argued among other things that the trial court wrongly permitted the prosecution as a matter of state law to elicit and comment upon "irrelevant and prejudicial testimony" regarding Petitioner's affiliation with the Schoolcraft Boys.  *People v. Blackmon*, 2001 WL 1081603, at *1 (Mich. App. 2001) (unpublished).  The Michigan Court of Appeals held *as a matter of state law* that the "evidence regarding [Petitioner's] alleged association with the Schoolcraft Gang was unfairly prejudicial and merited exclusion under M[ich.] R[.] E[vid.] 403" because "the record is void of any evidence that the shooting was in any way gang related."  *Id.* at *2.  The court further held "the prosecution's repeated elicitation of such testimony and argument to the jury in the absence of a factual basis to support its theory constituted prosecutorial misconduct."[5]  *Id.*  The appellate court concluded, however, that the

---

. . . .

Aplt's App. at 278.

[5] We wonder how the prosecution's actions could be labeled "misconduct" when the trial court ruled testimony of Petitioner's gang affiliation was relevant and admissible.  *See Webb v. Mitchell*, 586 F.3d 383, 397 (6th Cir. 2009) ("A prosecutor may rely in good faith on evidentiary rulings made by the state trial judge and make arguments in reliance on those rulings.").  The label is unimportant, however,

trial court's erroneous admission of gang-related testimony and the prosecution's improper comments thereon were harmless:

> Notwithstanding the instances of prosecutorial misconduct and the erroneous admission of gang evidence, we conclude that reversal is not required.  In order to overcome the presumption that preserved nonconstitutional error is harmless, a defendant must persuade the reviewing court that it is more probable than not that the error in question was outcome determinative. . . .
>
> In this case, the untainted evidence against defendant was overwhelming.  Hearn testified that he saw defendant "turn and start shooting."  Anderson testified about defendant, "I saw him shoot."  Hearn's and Anderson's eye-witness testimony alone would support a conviction of the crimes charged.  Given the strong evidence of defendant's guilt, we are confident that the improper admission of gang affiliation and prosecutorial misconduct did not undermine the reliability of the verdict and was therefore not outcome determinative.

*Id.* at *3 (internal brackets omitted).  The Michigan Supreme Court denied Petitioner leave to appeal.  *People v. Blackmon*, 649 N.W.2d 78 (Mich. 2002).

After unsuccessfully seeking post-conviction relief in state court, Petitioner sought a writ of habeas corpus pursuant to § 2254 in federal district court.  This time Petitioner claimed the errors recognized by the Michigan Court of Appeals deprived him of his due process right to a fair trial in violation of the Fourteenth Amendment.  The district court held the trial court's admission of gang-related testimony and the prosecution's statements before the jury about Petitioner's gang membership deprived him of a fair trial.  The court granted Petitioner a conditional writ.  *Blackmon v. Booker*, 312 F. Supp. 2d 874 (E.D. Mich. 2004).  The State appealed and we reversed without reaching the constitutional questions.  We instructed the district court to dismiss the petition for failure to exhaust because Petitioner had not fairly presented his federal constitutional claims to the state courts, and still had an opportunity to do so.  *Blackmon v. Booker*, 394 F.3d 399 (6th Cir. 2004).

---

as the question before us remains whether, applying § 2254(d)(1), the introduction of such testimony and the prosecution's comments thereon deprived Petitioner of due process in contravention of "clearly established Federal law, as determined by the Supreme Court of the United States."

To make an already long story shorter, Petitioner was back before the Michigan Court of Appeals four years later after the state trial court again denied him post-conviction relief.  The appellate court couched Petitioner's constitutional claims solely in terms of prosecutorial misconduct:  "Here, the prosecutorial misconduct consisted of (1) improper elicitation of gang-affiliation testimony, [and] (2) improper argument to the jury concerning defendant's alleged gang affiliation."  *People v. Blackmon*, 761 N.W.2d 172, 177 (Mich. App. 2008); *see Blackmon*, 762 F. Supp. 3d at 1039 n.5 ("To be fair, the court notes that the Michigan Court of Appeals likely did not separately address the evidentiary issue because Petitioner's counsel did not brief it as such.").  As to the question of the improper elicitation of gang-related testimony, the court opined the prosecution's inquiries "were supported by specific evidentiary rulings by the trial court" and "did not so infect the trial with unfairness as to deprive defendant of due process." *Id.* at 182.  In fact, this time around the appellate court *for purposes of federal constitutional analysis* acknowledged that evidence of Petitioner's gang-affiliation "supported the prosecution's theory" of the case.  *Id.* at 175; *compare Blackmon*, 2001 WL 1081603, at *2 (reasoning for purposes of state law analysis that evidence of Petitioner's gang affiliation did not support the prosecution's theory of the case). Meanwhile, on the question of the prosecution's improper argument to the jury concerning such testimony, the court explained:

> We also conclude that the misconduct consisting of improper argument to the jury did not so infect the trial with unfairness as to render [defendant's] conviction[s] a denial of due process.  There was evidence that defendant was a member of the Schoolcraft gang and that these crimes (shooting of innocent bystanders) were committed because defendant was coming to the aid of fellow gang member Crost.  Crost had visited Kenyatta Simons' girlfriend, Nancy Ellis, who testified that Simons threatened to harm Crost, and that Crost made a telephone call asking to be picked up because of some trouble.  Hearn testified that defendant arrived, spoke to Crost and then fired several shots, two of which hit Hearn as he stood near Simons.  This evidence suggests (and the jury concluded) that defendant intended to shoot and murder Simons (for threatening to harm Crost), but instead hit the victims.  Thus, there was evidence that defendant's crimes were gang-motivated, or at least gang-related.  Accordingly, the prosecution's misconduct, consisting of improper argument to the jury regarding defendant's gang affiliation, did

not rise to the level of a constitutional violation, because it did not so infect the trial with unfairness as to render [defendant's] conviction[s] a deprivation of liberty without due process of law.

*Id.* The Michigan Supreme Court again denied review. *People v. Blackmon*, 765 N.W.2d 339 (Mich. 2009).

Petitioner thereafter renewed his § 2254 application for a writ of habeas corpus before the federal district court. In his amended petition, Petitioner once again claimed the state trial court deprived him of the right to a fair trial in violation of the Due Process Clause by permitting the prosecution to (1) introduce irrelevant and highly prejudicial testimony regarding his gang affiliation and (2) comment repeatedly on that testimony. *See Blackmon*, 762 F. Supp. 2d at 1038. Contrary to the Michigan Court of Appeals' decision, the district court held the state trial court's admission of testimony regarding Petitioner's gang affiliation rendered his trial fundamentally unfair within the meaning of the Fourteenth Amendment:

> [T]he admission of the gang evidence eroded the presumption of innocence because it encouraged jurors to find Petitioner guilty of offenses based upon his purported gang affiliation rather than the evidence presented at trial. Such a process is inconsistent with the demands of due process and the constitutional guarantee of a fair trial. Given the limited probative value of the gang affiliation testimony and its highly prejudicial effect upon the jury, this court concludes that the trial court constitutionally erred in admitting such testimony.

*Id.* at 1042. The court further held the prosecution's comments regarding Petitioner's alleged gang ties constituted misconduct and likewise "rendered Petitioner's trial fundamentally unfair in violation of the Constitution." *Id.* at 1045.

### III.

The Supreme Court has observed that "[f]ederal habeas review of state convictions frustrates both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights." *Harrington*, 131 S. Ct. at 787. This is why AEDPA, much to the consternation of some courts, restricts habeas review of federal claims previously "adjudicated on the merits" in state court. As the district court

here ostensibly recognized, the strictures of § 2254(d)(1) limit federal review of Petitioner's state convictions:

> **(d)** An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> **(1)** resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

28 U.S.C. § 2254(d)(1). We may limit our review still further by distinguishing between (d)(1)'s references to state court decisions that are "contrary to," and those that involve an "unreasonable application of, clearly established Federal law, as determined by the Supreme Court:"[6]

> Under [subsection (d)(1)'s] "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412–13 (2000).

---

[6] Alternatively, subsection (d)(2) limits issuance of the writ to those federal claims previously adjudicated in state court that "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). We do not read the district court's opinion to say the Michigan Court of Appeals' denial of post-conviction relief involved such a decision. A jury determined the facts in this case. The district court did not purport to identify any mistaken factual *determination* of the appellate court. Rather, the district court pointed out some weaknesses in the prosecution's case (weaknesses the jury was entitled to discount) and concluded "the record reveals that the evidence against Petitioner was far from overwhelming." *Blackmon*, 762 F. Supp. 2d at 1043 (noting Petitioner's convictions rested not on any "physical evidence linking Petitioner to the shooting" but on the identification testimony of only two witnesses whose testimony was "subject to significant challenge"). The district court differed with the state court's characterization, or "application of . . . the facts," not the facts themselves. *Id.* at 1040, 1046. *See Bobby v. Dixon*, 132 S. Ct. 26, 29 n.1 (2011) (per curiam) (refusing to apply subsection (d)(2) where the federal court differed from the state court "only on the ultimate characterization" of the facts).

Neither Petitioner nor the district court have ever seriously suggested the Michigan Court of Appeals' adjudication of Petitioner's constitutional claims resulted in a decision that was "contrary to . . . clearly established" Supreme Court precedent. Nor, as we shall see, could they do so. To our knowledge, the Supreme Court has never held (except *perhaps* within the capital sentencing context) that a state trial court's admission of *relevant* evidence, no matter how prejudicial, amounted to a violation of due process. *Cf. Dowling v. United States*, 493 U.S. 342, 352–54 (1990) (holding the admission of prior bad acts evidence that had "the potential to prejudice the jury" but was "at least circumstantially valuable in proving petitioner's guilt" did not violate due process); *Estelle v. McGuire*, 502 U.S. 62, 67–70 (1991) (holding the admission of prior injury evidence tending to prove battered child syndrome did not violate due process). Accordingly, *the only question before us is whether the Michigan state court's adjudication of Petitioner's constitutional claims "resulted in a decision that . . . involved an unreasonable application of clearly established" Supreme Court law to the facts of this case*. 28 U.S.C. § 2254(d)(1) (emphasis added).

Under AEDPA's "unreasonable application" clause, habeas relief is available only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Harrington*, 131 S. Ct. at 786. A federal court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411. Rather, to justify issuance of a writ, the state court's application of "clearly established" Supreme Court authority must be "objectively unreasonable." *Id.* at 409. And in making that determination, a federal court must not forget that the specificity of the legal principle to be applied affects the range of reasonable judgment in the principle's application to the facts of a particular case:

> If a legal rule is specific, the range may be narrow. Applications of the rule may be plainly correct or incorrect. Other rules are more general, and their meaning must emerge in application over the course of time. Applying a general standard to a specific case can demand a substantial

element of judgment.  As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway court's have in reaching outcomes in case-by-case determinations.

*Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

On post-conviction review, the Michigan Court of Appeals framed the question as whether  the prosecution's elicitation of, and comment upon, testimony regarding Petitioner's gang affiliation "so infected [Petitioner's] trial with unfairness as to make [his] resulting conviction[s] a denial of due process of law." *Blackmon*, 761 N.W.2d at 178.  As framed, the state's court's inquiry undoubtedly reflects the general due process standard applicable to Petitioner's claim of prosecutorial misconduct.  In *Darden v. Wainwright*, 477 U.S. 168, 181 (1986), the Supreme Court held a prosecutor's numerous improper comments to a jury in a capital murder case did not violate the Constitution because they had not "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  Just last Term, the Court recognized that "[t]he 'clearly established Federal law' relevant [to constitutional claims of prosecutorial misconduct] is our decision in *Darden*." *Parker v. Matthews*, 132 S. Ct. 2148,  2153 (2012) (per curiam).

Endorsing a virtually identical due process standard by which to measure a trial court's admission of evidence, the Supreme Court in *Payne v. Tennessee*, 501 U.S. 808 (1991), cited *Darden* exclusively.  In holding victim impact evidence introduced at the penalty phase of a capital trial admissible, the Court cautioned:  "In the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief."  *Id.* at 825 (citing *Darden*, 477 U.S. at 179–83); *see also Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) (holding the trial court's exclusion of testimony coupled with its refusal to permit cross-examination denied defendant "a trial in accord with traditional and fundamental standards of due process").  Undoubtedly, the Michigan Court of Appeals,  consistent with "clearly established" Supreme Court precedent,

properly identified the legal principle —fundamental fairness—applicable to Petitioner's constitutional claims.**[7]** *See Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003) ("[C]learly established Federal law" under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.").

Now that we have identified the legal principle applicable to Petitioner's due process claims, determining whether the state appellate court unreasonably applied that principle to the facts of his case is our remaining task. The Supreme Court has explained that "[b]eyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation." *Dowling*, 493 U.S. at 352. Accordingly, the Court has "defined the category of infractions that violate 'fundamental fairness' *very narrowly*." *Id.* (emphasis added). In particular, the Court has recognized that "the *Darden* standard is a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case determinations.'" *Parker*, 132 S. Ct. at 2155 (ellipses in original) (quoting *Yarborough*, 541 U.S. at 664). Perhaps this is why the district court's opinion cites *no* Supreme Court decision that even remotely suggests an inferior federal court should resolve the constitutional questions here presented in Petitioner's favor—let alone on an evidentiary record comparable to the one before us. *See Wright v. Van Patten*, 552 U.S. 120, 126 (2008).

In analyzing Petitioner's claim that the state trial court committed constitutional error by allowing the prosecution to elicit testimony regarding his membership in the Schoolcraft Boys, the district court cited a host of federal district and circuit court

---

**[7]** Because a state trial court's evidentiary rulings must comport with federal due process, Petitioner argues the Michigan Court of Appeals' statement that "[e]videntiary errors are nonconstitutional" establishes the state court's decision to deny him post-conviction relief involved an unreasonable application of Supreme Court precedent. *Blackmon*, 761 N.W.2d at 176. But this statement is hardly sufficient in itself to establish Petitioner's entitlement to habeas relief. *Cf. Harrington*, 131 S. Ct. at 784 ("Where a state court's decision is unaccompanied by an explanation," the habeas petitioner must still meet his burden "by showing there was no reasonable basis for the state court to deny relief."). More importantly, the state appellate court effectively adjudicated the constitutional aspect of Petitioner's evidentiary claim when it decided, within the rubric of prosecutorial misconduct, that the "evidentiary misconduct did not so infect the trial with unfairness as to deprive [Petitioner] of due process." *Blackmon*, 761 N.W.2d at 182. The prosecution was able to elicit testimony about Petitioner's gang affiliation only because the state trial court deemed it admissible. And because the Supreme Court has told us we are to judge Petitioner's two constitutional claims—evidentiary error and prosecutorial misconduct—under the same standard of fundamental fairness, the appellate court's statement, though overbroad, was inconsequential.

decisions discussing the admissibility of gang-related evidence. *See Blackmon*, 762 F. Supp. 2d at 1040–42. The district court repeatedly prefaced its discussion by stating "federal courts have ruled," "[f]ederal courts have long-recognized," and "[f]ederal courts have found." *Id.* at 1040–41. Suffice to say "circuit [and district] precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,' 28 U.S.C. § 2254(d)(1). It therefore cannot form the basis for habeas relief under AEDPA." *Parker*, 132 S. Ct. at 2155. Nor can Petitioner defend the district court's reliance on lower court precedents, including our own "on the ground that they merely reflect what has been 'clearly established' by [Supreme Court] cases." *Id.* After referencing the constitutional standard of fundamental fairness, the district court cited two Supreme Court decisions in its discussion of Petitioner's evidentiary claim. But neither of these decisions suggests in the slightest that the Michigan Court of Appeals' application of Supreme Court authority was objectively unreasonable in this case.

The first case, *United States v. Abel*, 469 U.S. 45 (1984), did not even involve a constitutional claim of evidentiary error, but a claim arising under the Federal Rules of Evidence. And as the district court recognized, *Abel* stands for the unremarkable proposition that "the admission of gang affiliation testimony may be appropriate when it is probative of a witness's bias toward a defendant." *Blackmon*, 762 F. Supp. 2d at 1040. Specifically, the Supreme Court held that "evidence showing [a witness's] and [defendant's] membership in the [same] prison gang was sufficiently probative of [the witness's] possible bias towards [defendant] to warrant its admission into evidence." *Abel*, 469 U.S. at 49. The Court reasoned:

> Bias is a term used in the "common law of evidence" to describe the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party. *Bias may be induced by a witness' like, dislike, or fear of a party, or by the witness' self interest. Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony.*

*Id.* at 52 (emphasis added).

Given *Abel*'s conclusion that the defendant's and witness's gang membership in that case could bear on the "accuracy and truth" of the witness's testimony, surely the apparent fear generated by Petitioner's and Crost's membership in the Schoolcraft Boys may have bore on the "accuracy and truth" of numerous witnesses' testimony in this case. In other words, if the admission of the gang-related evidence in *Abel* did not violate the Federal Rules of Evidence, surely the admission of similar evidence in this case viewed through the lense of AEDPA was not fundamentally unfair. One need not have a degree in criminal justice to understand the violent and retributive nature of urban street gangs, often at the expense of innocent victims.[8] *See id.* at 53 ("[T]he jury may be permitted to draw an inference of subscription to the tenets of an organization from membership alone."). On the evidentiary record before us, a jury could conclude the Schoolcraft Boys' tendency to violence as illustrated by the events in question provided the prosecution's witnesses with a reason to slant their testimony in favor of Petitioner or "even commit perjury outright." *Id.* at 54 (explaining the attributes of gang membership may bear directly "not only on the *fact* of bias but also on the *source* and *strength* of [that] bias").

The record indicates that at least five Government witnesses, namely Nancy Ellis, Adrienne Ellis, Tiffany Coggans, Autumn Taylor and Kenyatta Simons, gave statements to the police within hours after the shootings. These statements to varying degrees tended to implicate Petitioner in the April 12 shootings on Woodmont Street. A year later, this time before a jury, Petitioner, and the public, those same witnesses were reluctant to confirm their initial version of events. In fact, each of those witnesses except Nancy Ellis denied the truth of his or her prior statements in whole or in part. The prosecution, through the testimony of Tiffany Smith and Arthur Anderson and the questioning of other witnesses, sought to attribute the change to its witnesses' fear of gang reprisal. Meanwhile, the defense on cross-examination suggested the police had

---

[8]According to one commonly accepted definition: "A gang is a group of recurrently associating individuals with identifiable leadership and internal organization identifying with or claiming control over territory in the community and engaging either individually or collectively in violent or other forms of illegal behavior." Walter B. Miller, *Violence by Youth Gangs and Youth Groups as a Crime Problem in Major American Cities* 9 (Nat'l Inst. for Juv. Just. and Delinq. Prev. 1975).

strong-armed the prosecution's witnesses into implicating Petitioner. Which side to believe was the jury's call. Reweighing the evidence, the district court invaded the province of the jury when it discounted the prosecution's theory of witness bias in favor of the defense's under the auspices of a constitutional analysis.[9] *See Abel*, 469 U.S. at 54 ("Assessing the probative value of common membership in any particular group, and weighing any factors counseling against admissibility is a matter first for the [trial] court's sound judgment under Rules 401 and 403 and ultimately, if the evidence is admitted, for the trier of fact.")

The district court also cited the Supreme Court's decision in *Dawson v. Delaware*, 503 U.S. 159 (1992), to support its issuance of the writ on the basis of evidentiary error. In *Dawson*, the Court held the State violated a defendant's First Amendment right to association when it introduced evidence in a capital sentencing proceeding that defendant was a member of the Aryan Brotherhood, even though "the evidence ha[d] *no* relevance to the issues being decided in the proceeding." *Id.* at 160 (emphasis added). On the record presented, the Court was "left with the feeling that the Aryan Brotherhood evidence was employed simply because the jury would find [the gang's] beliefs morally reprehensible." *Id.* at 167.

Where a specific guarantee of the Bill of Rights such as the First Amendment is involved, a federal court on habeas review must take "special care" to assure itself that the state court's alleged evidentiary error did not impermissibly infringe such guarantee

---

[9] The district court's discussion of the (un)likelihood of witness bias attributable to Petitioner's gang affiliation provides just one example of the court improperly reweighing the evidence to reach a conclusion inconsistent with the jury's verdicts:

> Most witnesses, including Michael Hearn, Tiffany Smith, Nancy Ellis, and Adrienne Ellis, denied being afraid of Petitioner. Several witnesses, including Michael Hearn, Nancy Ellis, Adrienne Ellis, and Arthur Anderson, stated that they were pressured by police and intimidated by prosecuting authorities. Of the witnesses who seemed reluctant to testify, only one, Arthur Anderson, indicated that he feared Petitioner because of his gang membership. However, Anderson then clarified that he felt intimidated and was reluctant to testify because it was a murder trial. Anderson further stated that he would have felt the same way no matter who was on trial.

*Blackmon*, 762 F. Supp. 2d at 1040. We find nothing remarkable about the prosecution witnesses' reluctance to acknowledge fear of retribution from the Schoolcraft Boys, an alleged member of which was on trial for crimes of violence. Neither, obviously, did the jury.

as interpreted by the Supreme Court.  *Donnelly*, 416 U.S. at 643.  But Petitioner's evidentiary claim is that the prosecution's elicitation of gang-related evidence, and the trial court's admission thereof, so infected his trial with unfairness as to make the resulting conviction a denial of his right to due process.  *See id.*  Unlike a First Amendment claim, Petitioner's due process claim calls for the application of a general standard posing a "greater . . . potential for reasoned disagreement among fair-minded judges," and thus much less likely to support issuance of a writ.  *Renico v. Lett*, 130 S. Ct. 1855, 1864 (2010).

Moreover, unlike the challenged evidence in *Dawson*, the evidence of Petitioner's gang affiliation most certainly was relevant, at least for purposes of federal due process analysis.  *See Blackmon*, 761 N.W.2d at 183 (White, J., concurring) (recognizing the distinction between state evidentiary error and federal constitutional error).  As we have just explained, the gang affiliation evidence tended to make the fact of witness bias in favor of Petitioner based on fear more probable.  Of equal if not greater importance, such evidence also tended to make Petitioner's presence at the scene of the shootings, where *at least* two individuals clearly saw him fire a gun into the crowd, more likely "than it would be without the evidence." Fed. R. Evid. 401 (defining relevant evidence as that having a "tendency to make a fact more or less probable than it would be without the evidence").  This is a critical point the district court simply failed to grasp in its mischaracterization of the record:

> [T]estimony regarding Petitioner's alleged gang membership was not necessary for the prosecution to establish its case and had little probative value. . . . There was no evidence indicating the shooting was motivated by gang activity.  To the contrary, the testimony revealed that the shooting arose from a domestic situation involving Nancy Ellis, Kenyatta Simons, and Duane Harris [*i.e.*, Jimmy Crost].  The prosecution offered testimony to demonstrate a friendship between [Crost] and Petitioner and had no cause to resort to the introduction of gang-affiliation testimony and argument to show motive, particularly since [Crost] and Petitioner both denied gang membership.

*Blackmon*, 762 F. Supp. 2d at 1040.

Notwithstanding uncontroverted evidence of the friendship between Petitioner and Crost, however, even the defense in its closing statement suggested to the jury that "it makes no sense for Roy Blackmun to be down there [on Woodmont Street] shooting people he doesn't know." Trial Tr. at 783. Petitioner's presence at the scene does not make sense simply because Petitioner and Crost were friends. Petitioner claimed he was at home when the shootings occurred and denied receiving a phone call from Crost shortly before the shootings. Consequently, Petitioner never claimed he went to pick up Crost from Nancy Ellis' house. For his part, Crost denied he phoned Petitioner in response to Kenyatta's Simons' threat. To make sense of it, the prosecution presented evidence of Petitioner's and Crost's common gang membership. This evidence supported in no small measure the inference arising from Nancy's testimony that Crost had phoned Petitioner and asked him to come to Woodmont Street where trouble was brewing. Or in the words of the prosecutor: "I've shown what took place between [Simons] and [Crost] and there's the motive. Having some problems over here on Woodmont, send your boys—send some boys out, send some of my gang, my group." Trial Tr. at 811. Based on evidence of Petitioner's and Crost's membership in the Schoolcraft Boys, the jury could readily infer an allegiance between the two men significantly stronger than mere friendship—an allegiance lending credence to the prosecution's theory of the case and raising doubt about the veracity of Petitioner's and Crost's denials. *See Abel*, 469 U.S. at 52 ("A witness' and party's common membership in an organization, even without proof that the witness or party has personally adopted its tenets, is certainly probative of bias."). The Michigan Court of Appeals' characterization of the facts is at least as plausible, and probably much more so, than the district court's recharacterization. The state court's characterization bears repeating:

> There was evidence that defendant was a member of the Schoolcraft gang and that these crimes (shooting of innocent bystanders) were committed because defendant was coming to the aid of fellow gang member Crost. Crost had visited Kenyatta Simons's girlfriend, Nancy Ellis, who testified that Simons threatened to harm Crost, and that Crost made a telephone call asking to be picked up because of some trouble. Hearn testified that defendant arrived, spoke to Crost and then fired several shots, two of which hit Hearn as he stood near Simons. This evidence

suggests (and the jury evidently concluded) that defendant intended to shoot and murder Simons (for threatening to harm Crost), but instead hit the victims. Thus, there was evidence that defendant's crimes were gang-motivated, or at least gang-related.[**10**]

*Blackmon*, 761 N.W.2d at 182.

The point is this: Based on the record evidence, the Michigan Court of Appeals' decision upholding the prosecution's elicitation, and the trial court's admission, of evidence related to Petitioner's gang affiliation "was not objectively unreasonable." *Renico*, 130 S. Ct. at 1865. The Supreme Court has told us that in applying § 2254(d)(1), we first must determine what reasons "supported or . . . could have supported the state court's decision." *Harrington*, 131 S. Ct. at 786. We have just explained that the Michigan Court of Appeals decided, or could have decided, the admission of gang-related evidence against Petitioner did not render his trial fundamentally unfair because such evidence was relevant to show both witness bias and criminal motive. We next ask whether a fairminded jurist might agree that the state court's decision did *not* conflict with then-existing Supreme Court precedent. *See id.* The straight answer is yes. Accordingly, the Michigan Court of Appeals' decision was not objectively unreasonable and Petitioner is not entitled to habeas relief under the AEDPA standard. The district court's analysis ignored the myriad of limitations that § 2254(d)(1) imposed on its review, and thus failed to afford the Michigan Court of Appeals the deference AEDPA demands. *See Renico*, 130 S. Ct. at 1862 (explaining AEDPA imposes a "highly deferential standard" on habeas review and demands that state court resolutions of constitutional claims "be given the benefit of the doubt").

At this point, not much remains of Petitioner's additional claim that the prosecution's gang-related comments before the jury rendered his trial fundamentally unfair. The district court cited no Supreme Court decision, and we have found none, to support the proposition that notions of "fundamental fairness" prohibit the prosecution

---

**10** As our earlier factual recitation confirms, other eyewitness testimony apart from Crost's did not conflict with Hearn's testimony but rather tended to confirm it to varying degrees. We need not restate that evidence here lest we belabor the point.

from emphasizing *relevant* evidence, regardless of its nature, bearing on either a witness's bias or a criminal defendant's motive, or both. Instead, the district court analyzed Petitioner's constitutional claim of prosecutorial misconduct under our own Sixth Circuit precedents and applied a multistep test "for determining whether prosecutorial misconduct violates a defendant's due process rights." *Blackmon*, 762 F. Supp. 2d at 1045 (citing *Macias v. Makowski*, 291 F.3d 447, 452 (6th Cir. 2002)). But because, in the Supreme Court's words, "[t]he highly generalized standard for evaluating claims of prosecutorial misconduct set forth in *Darden* bears scant resemblance to the elaborate, multistep test employed by the Sixth Circuit," our test has no application on collateral review of a state court conviction under § 2254(d)(1).[11] *Parker* 132 S. Ct. at 2155.

In any event, the only prosecutorial comment to the jury that gives us momentary pause was that Petitioner would "take care of business later" and "should have wrote tombstones on [the witnesses'] front doors" because he had not "scare[d] these witnesses enough" to keep them from testifying against him. Trial Tr. at 812. Notably, this comment came in response to the defense's own series of comments, which we earlier recounted, suggesting the prosecution was seeking to convict Petitioner based on his suspect character. One such comment summarized the whole: "So the theory of this case from the prosecutor's standpoint is . . . really what you ought to convict [Petitioner] for is for being in a gang." *Id.* at 794; *see Darden*, 477 U.S. at 182 (explaining the "idea of 'invited response'" was not designed to excuse improper comments "but to determine their effect on the trial as a whole"). But even assuming the prosecution's comment was unduly inflammatory, this would not establish that the Michigan Court of Appeals' "rejection of the *Darden* prosecutorial misconduct claim 'was so lacking in justification

---

[11]In applying that multistep test to the prosecution's statements, the district court concluded those statements were improper because (1) "the prosecutor did not have a legitimate purpose for soliciting the gang affiliation evidence"; (2) "the prosecutor's statements concerning the gang evidence were flagrant"; (3) "the prosecutor's statements were not isolated in nature, but rather constituted a pattern of questioning and argument throughout trial"; and (4) "the evidence against Petitioner was not overwhelming." *Blackmon*, 762 F. Supp. 2d at 1045–46. As the reader surely understands by now, points (1), (2), and (4) find little basis in the record viewed in a light most favorable to the jury's verdicts. Point (3) is arguable only because evidence of Petitioner's gang affiliation bore directly on important questions for the jury regarding witness credibility and criminal motive.

that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'"  *Parker*, 132 S. Ct. at 2155 (quoting *Harrington*, 131 S. Ct. at 786–87).

*Darden* held a closing statement that contained a series of inflammatory remarks did not warrant issuance of a writ:

> The prosecutors . . . closing argument . . . deserves the condemnation it has received from every court to review it, although no court has held that the argument rendered the trial unfair.  Several of the comments attempted to place some of the blame for the crime on the Division of Corrections, because Darden was on weekend furlough from a prison when the [shootings] occurred.  Some comments implied that the death penalty would be the only guarantee against a future similar act.  Others incorporated the defense's use of the word "animal."  [The prosecutors] made several offensive comments reflecting an emotional reaction to the [heinous facts of the] case.  These comments were undoubtedly improper. But as both the district court and the original panel of the court of appeals . . . recognized, it is not enough that the prosecutors' remarks were undesirable or even universally condemned.  The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process.

*Darden*, 477 U.S. at 179–81 (internal footnotes, citations, and quotations omitted).  The Supreme Court's denial of habeas relief in *Darden* coupled with the fact that the "*Darden* standard is a very general one" satisfies us the district court had no business setting aside the Michigan Court of Appeals' decision on the basis that the prosecution's opening and closing statements rendered Petitioner's trial fundamentally unfair. *Parker*, 132 S. Ct. at 2155.

The district court's failure to adhere to the strictures of § 2254(d)(1), as construed by the Supreme Court, resulted in the court's "improper intervention in state criminal processes, contrary to the purpose and mandate of AEDPA and to the now well-settled meaning and function of habeas corpus in the federal system." *Harrington*, 131 S. Ct. at 787.  Accordingly, the district court's issuance of the writ of habeas corpus is reversed.  This cause is remanded to the district court with instructions to deny the writ.

REVERSED and REMANDED.