**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 14a0113n.06**

**No. 11-2103**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**
Feb 10, 2014
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| TINA MARIE CLARKE, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | EASTERN DISTRICT OF MICHIGAN |
| MILLICENT WARREN, | ) | |
| | ) | |
| Respondent-Appellee. | ) | |
| | ) | |

Before: MOORE, GIBBONS, and SUTTON, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge.** Tina Clarke partnered with an associate, Patricia Plummer, to rob and kill two brothers in 2001. During the ensuing state-court jury trial, the prosecutor and trial court made a number of misstatements and gave the jurors several pieces of misinformation. The jury convicted Clarke of armed robbery and felony murder, among other charges, and the trial court sentenced Clarke to a lifetime term of imprisonment. Her case comes before this court on appeal of the district court's denial of her petition for a writ of *habeas corpus*. Her claims fall into three categories: prosecutorial misconduct, erroneous jury instructions, and ineffective assistance of trial counsel. The state courts denied her claims on direct appeal and collateral review, and we now affirm the district court's denial of Clarke's petition.

-1-

**I.**[1]

Late in the evening of January 24, 2001, a group of five people, including Clarke, Plummer, and Kevin Debus, visited a convenience store in Grand Blanc Township, Michigan. Plummer spoke with another person, Kim Crider, outside the store before inviting Clarke to return to Crider's house with her. As their three companions waited outside in a van, Clarke and Plummer went into Crider's house and encountered four men: three brothers—Kim Crider, John Crider, and Randy Crider—and their friend. Plummer and Clarke socialized with the four men, and at some point Clarke walked back to the store to purchase alcohol with Randy Crider, who pulled a "fat wad of cash" from his pocket. Clarke returned to the Criders' house, where she told Plummer about Randy Crider's cash, and Plummer and Clarke left soon thereafter to rejoin their three companions.

As they rode back to Debus's house in the van, Plummer said she wanted to return to the men's house to rob them. Plummer also told Clarke that she "wanted and planned to shoot" the Criders. Upon their arrival at Debus's house, Plummer and Clarke changed into black clothes. Clarke, Plummer, and Debus then returned to the Criders' house in the van, where Debus waited as the women went into the house. In her pocket, Clarke was carrying a loaded handgun that she had

---

[1]Factual determinations made by the state courts are presumed to be correct on *habeas* review, 28 U.S.C. § 2254(e)(1), and the evidence must be viewed "in the light most favorable to the prosecution," *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "On habeas review pursuant to § 2254," moreover, "a 'court faced with a record of historical facts that supports conflicting inferences . . . must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Blackmon v. Booker*, 696 F.3d 536, 538 (6th Cir. 2012) (quoting *McDaniel v. Brown*, 558 U.S. 120, 133 (2010)). Accordingly, these facts are taken from the state-court decisions and, where there are gaps, are supplemented with record evidence that supports the prosecution's version of the facts.

just procured to protect herself from a violent acquaintance. Only Kim and John Crider were at the house; Randy Crider, the man with the wad of cash, had left.

The two women went into the bathroom, and Clarke handed the gun to Plummer because Clarke "didn't have the guts to do it" herself. When they emerged from the bathroom, Plummer shot Kim and John Crider multiple times. Plummer grabbed a wallet, and the two women fled. Kim Crider died within the hour. John Crider went, bleeding, to his neighbor's house and said he had been robbed by two white women. He died from the gunshot wounds two weeks later.

Police arrested Clarke around 1 a.m. on January 26 after recovering her pistol from another individual during a traffic stop. During an interrogation with Detective Donald Elford about an hour later, Clarke divulged most of the details of the shooting, including much of the information that was used against her at trial. She confessed that she had acquired the pistol to shoot David Smith, a drug dealer who had severely abused Clarke two weeks before the shooting. She also said that Plummer had given the stolen wallet to Debus when the two women returned to the van.

Clarke, Plummer, and Debus were tried together, but each defendant had a separate jury. At the end of the trial, Clarke was convicted of two counts of felony murder and one count each of armed robbery, conspiracy to commit armed robbery, felon in possession of a firearm, and possession of a firearm during the commission of a felony. The trial court sentenced Clarke to life imprisonment for the two murders, the armed robbery, and the conspiracy; thirty-eight to ninety months of imprisonment for the felon-in-possession conviction; and an additional twenty-four months of imprisonment for the felony firearm conviction.

On direct appeal, Clarke attacked the convictions on several bases: insufficiency of the evidence, prosecutorial misconduct, erroneous jury instructions, and ineffective assistance of counsel based on her attorney's failure to object to the jury instructions. The Michigan Court of Appeals affirmed Clarke's convictions. *See People v. Clarke*, No. 238359, 2003 WL 22138022, at *1 (Mich Ct. App. Sept. 16, 2003) (per curiam). The Michigan Supreme Court denied her request for leave to appeal. *People v. Clarke*, 679 N.W.2d 60 (Mich. 2004). Clarke subsequently filed a petition for a writ of *habeas corpus* in the federal district court. After the warden filed his response, however, Clarke asked the district court to hold her petition in abeyance until she had presented several new claims to the state courts. The district court granted Clarke's request in September 2006.

Clarke then filed a motion for relief from the judgment in the state trial court. She advanced six bases for relief: (1) the state district court abused its discretion when it bound her over to circuit court, (2) certain jurors were biased against her, (3) the trial court's jury instructions were erroneous, (4) she should not have been tried jointly with Plummer and Debus, (5) her trial counsel was ineffective, and (6) the prosecutor did not produce all endorsed witnesses. The court denied Clarke's motion, and both the Michigan Court of Appeals and the Michigan Supreme Court denied her requests for leave to appeal.

Clarke filed another petition for a writ of *habeas corpus* in the federal district court in March 2009. Although the new petition was composed of three claims that Clarke had not raised in her initial petition, the district court treated the new petition as an amendment of her prior petition. *Clarke v. Warren*, No. 05-60151, 2011 WL 2580686, at *3 (E.D. Mich. June 29, 2011). Six

categories of claims comprised the two petitions: (1) sufficiency of the evidence, (2) prosecutorial

misconduct, (3) erroneous jury instructions, (4) violations of state procedural law related to her

motion for relief from the judgment, (5) incompetent and false testimony by the state's pathologist,

and (6) ineffective assistance of trial and appellate counsel. The district court determined that the

state courts' decisions on the merits were neither contrary to nor unreasonable applications of

Supreme Court precedent, and the court denied her request for relief. The district court also denied

her request for a certificate of appealability. *Id.* at *21. Clarke filed a *pro se* motion for a certificate

of appealability in this court, and we permitted Clarke to appeal the following issues:

> (1) whether, during closing arguments, the prosecutor (a) misstated the evidence, (b) misstated the law on felony murder and accused Clarke of premeditated murder, (c) evoked sympathy for the victims and appealed to the jury's emotions, and (d) denigrated Clarke and her defense counsel;

> (2) whether the trial court gave inaccurate and confusing instructions to the jury on (a) the elements of armed robbery, (b) the *mens rea* necessary to prove felony murder, (c) the elements of the lesser-included offense of second-degree murder, and (d) aiding and abetting; and

> (3) whether trial counsel was ineffective for: (a) failing to move to suppress Clarke's statement to the police; (b) failing to use the court-appointed investigator to develop the defense; (c) failing to object to the prosecutor's comments; and (d) failing to obtain and call an expert witness to testify on post-traumatic stress disorder where Clarke claimed she was abducted, raped, and beaten two weeks before the crimes at issue and, for this reason, was emotionally distressed.

## II.

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 110 Stat. 1214,

a federal court may not grant *habeas* relief on a claim that the state court adjudicated on the merits

unless the state-court decision (1) "was contrary to, or involved an unreasonable application of,

clearly established Federal law, as determined by the Supreme Court," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

## III.

We turn first to the alleged prosecutorial misconduct. Clarke claims that the prosecutor "made a number of improper, flagrant, and prejudicial remarks" during his closing argument. More specifically, Clarke maintains that the prosecutor misstated the evidence, misstated the law, improperly appealed to the jurors' emotions, and denigrated both Clarke and her trial counsel.

The warden asks us not to address the first three of Clarke's four misconduct claims because she did not object to the alleged misconduct during the trial. Because we conclude that the alleged misconduct does not warrant *habeas* relief, though, we decline to determine whether Clarke procedurally defaulted on these claims. *See Smith v. Ohio Dep't of Rehab. & Corr.*, 463 F.3d 426, 429 n.2 (6th Cir. 2006) (citing extracircuit *habeas* cases affirming authority of federal courts to sidestep nonjurisdictional issue of procedural default). Instead we pass directly to the merits.

To determine whether prosecutorial misconduct transgressed the parameters of the Constitution, we ask whether the prosecutor's comments "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Blackmon v. Booker*, 696 F.3d 536, 551–52 (6th Cir. 2012) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). And because we review the alleged prosecutorial misconduct through the deferential lens of AEDPA rather than on direct appeal, our inquiry is even further circumscribed: Was the state court's decision contrary

to or an unreasonable application of the standard articulated in *Darden*? *Id.* (citing *Parker v. Matthews*, 132 S. Ct. 2148, 2153 (2012) (per curiam)).

**A.**

Clarke challenges four purported misrepresentations of the evidence during closing arguments: (1) the prosecutor stated that Clarke "manipulated" her cousin to obtain the firearm that Plummer used to shoot Kim and John Crider; (2) the prosecutor "suggest[ed] at least five times" that Clarke rather than Plummer shot the Criders; (3) the prosecutor incorrectly characterized a statement made by John Crider as his "last words"; and (4) the prosecutor stated at least twice that Clarke took Kim Crider's wallet after he had been shot. Each of the prosecutor's statements is addressed in turn.

1.

During his closing argument, the prosecutor stated that Clarke was "desperate to get a gun, and she got it from her cousin, a shirttail relative." "I'm sure all of you were sitting there thinking, ['W]hy? Why would you give her a gun? What was possessing you to do that?['] But [s]he manipulated him—she manipulated [her cousin]. She tried to make them think that she was in—that she was in danger. She needed some protection. And to get rid of her, he gave [her] the gun."

The Michigan Court of Appeals concluded that this statement was not prejudicial because "the court instructed the jury that the lawyers' arguments were not evidence." *Clarke*, 2003 WL 22138022, at *4. This was an incomplete application of *Darden*, which does not stand for the proposition that a generic curative instruction renders harmless all prior prosecutorial misconduct, no matter how abhorrent. *See Cauthern v. Colson*, --- F.3d ---, 2013 WL 6038981, at *9 (6th Cir. Nov. 14, 2013). But it was a reasonable application of *Darden*, where the Court excused the

prosecutor's comments during closing argument in part because "[t]he trial court instructed the jurors several times that their decision was to be made on the basis of the evidence alone, and that the arguments of counsel were not evidence." 477 U.S. at 182. It defies imagination to believe that any juror convicted Clarke because she had emotionally manipulated her cousin. *See id.* (stating that the "weight of the evidence against petitioner was heavy," which "reduced the likelihood that the jury's decision was influenced by the argument"). The intimation of emotional manipulation thus did not infect the trial with unfairness, *see id.* at 181, and the court of appeals did not unreasonably apply the relevant Supreme Court law.[2]

2.

The prosecutor also stated that Clarke shot Kim Crider several times because she wanted a couple bucks, and that Clarke "didn't want to be open, and honest, about the fact that she was the shooter. So, she put it on Patty Plummer. And that's okay. That's fine. No problem there. Because, as we all now know, that makes her just as guilty." The prosecutor later called Clarke "cold" because she "just murder[ed] somebody" and left him there like he was "just some sack of potatoes." Clarke contends that these statements were improper because the evidence established that Plummer, not Clarke, shot the Criders.

---

[2]Throughout her brief, Clarke cites and discusses Sixth Circuit precedents in non-AEDPA cases to establish that the Michigan Court of Appeals unreasonably applied the applicable law. Yet AEDPA confines the scope of our inquiry to whether the state courts unreasonably applied Supreme Court precedent. *See* § 2254(d)(1). Rules articulated in Sixth Circuit caselaw interpreting Supreme Court precedent therefore cannot serve as the basis for overturning the state court's decision. *See Matthews*, 132 S. Ct. at 2155–56.

The court of appeals again determined that there was no prejudice because the court instructed the jury that the lawyers' arguments were not evidence. *Clarke*, 2003 WL 22138022, at *4. As above, this was consistent with and a reasonable application of *Darden*. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 646 (1974) ("The consistent and repeated misrepresentation of a dramatic exhibit in evidence may profoundly impress a jury and may have a significant impact on the jury's deliberations. Isolated passages of a prosecutor's argument, billed in advance to the jury as a matter of opinion not of evidence, do not reach the same proportions.").

Clarke also cannot establish that the state court's decision was contrary to or an unreasonable application of other Supreme Court precedents. *See Richter*, 131 S. Ct. at 786 ("Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court."). This court and others have held that the due process guarantee is frustrated when prosecutors use contradictory theories to secure the convictions of two persons for the same crime. *See, e.g.*, *Stumpf v. Mitchell*, 367 F.3d 594, 611 (6th Cir. 2004), *overruled on other grounds by Bradshaw v. Stumpf*, 545 U.S. 175, 186–87 (2005); *Smith v. Groose*, 205 F.3d 1045, 1051 (8th Cir. 2000). But the Supreme Court has never reached that conclusion, and the state court's decision therefore was not inconsistent with Supreme Court precedent. Furthermore, in overruling the Sixth Circuit's decision in *Stumpf*, where the prosecutor made conflicting arguments about which person pulled the trigger, the Supreme Court stated that "the precise identity of the triggerman was immaterial to Stumpf's conviction for aggravated murder." *Stumpf*, 545 U.S. at 187. Here, too, the

shooter's identity was immaterial because Clarke could be convicted of felony murder as an aider and abettor even if she did not shoot the Crider brothers.[3] The prosecutor's repeated references to Clarke as the triggerwoman, even if inaccurate and without basis in the evidence, do not warrant the reversal of her conviction.

3.

The prosecutor stated: "John Crider was the first one to get shot. He was at the kitchen table. John Crider's last words after he had been shot one time, ['H]oney, you didn't mean to do that, did you?['] Oh, yeah, she did. And she shot him again. Yeah, she meant to do it. Here['s] another one. He's dead. There's his blood." But John Crider did not die in the house—he survived for two weeks and spoke to others before dying at the hospital—so those were not his "last words." Clarke argues that the statement was prejudicial because "it left the jury with the impression that the circumstances of John Crider's death were more dramatic than they actually were, thereby increasing the jury's sympathy for the victim."

Clarke cites no support for this argument, and the Michigan Court of Appeals found that the statement was an "isolated comment[]" that was not erroneous. *Clarke*, 2003 WL 22138022, at *4.

---

[3]The trial court instructed the jurors on the aiding-and-abetting statute, and the prosecutor pursued that theory of guilt in his closing argument. "To prove felony murder on an aiding and abetting theory, the prosecution must show that the defendant (1) performed acts or gave encouragement that assisted the commission of the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result, (3) while committing, attempting to commit, or assisting in the commission of the predicate felony." *People v. Riley*, 659 N.W.2d 611, 614 (Mich. 2003). Clarke satisfied the *mens rea* requirement if she participated in the robbery with knowledge of Plummer's intent to kill. *See id.*

This was a reasonable application of the law; Clarke cannot reasonably argue that the prosecutor's

characterization "so infected the trial with unfairness as to make the resulting conviction a denial

of due process." *Darden*, 477 U.S. at 181. The prosecutor's passing mischaracterization of Crider's

remarks as his "last words" did not impermissibly dramatize the shooting, nor was that

mischaracterization apt to solicit undue sympathies from the jurors.

4.

The prosecutor also stated that Clarke "took a wallet off of Kim Crider, after she had shot

him several times. She did it because she wanted some—a couple bucks." He later stated that, after

the two men had been shot, Clarke "went to Kim Crider, while he is bleeding on the bed, gurgling

and moaning, dying, and what does she do? What does she do? [']I went to cut off the wallet.[']

She cuts off the wallet off of Kim Crider. How cold is that?" But Elford testified that, according

to Clarke, *Plummer* took Kim Crider's wallet after the shootings—not Clarke. And the court of

appeals concluded that Plummer took the wallet. *Clarke*, 2003 WL 22138022, at *3. Clarke argues

that the prosecutor's statement was improper because he falsely accused her of taking the wallet in

spite of the unequivocal evidence establishing that Plummer was the thief.

The court of appeals concluded that any prejudice was cured when the trial court instructed

the jurors that the lawyers' arguments were not evidence. *Clarke*, 2003 WL 22138022, at *4. This

was a reasonable application of *Darden*. The prosecutor was entitled to cast doubt on Clarke's self-

serving statement fingering Plummer for the robbery. *See Darden*, 477 U.S. at 182; *Byrd v. Collins*,

209 F.3d 486, 535 (6th Cir. 2000) (stating that although prosecutors may not bring to the jurors'

attention purported facts that are not in evidence, prosecutors are permitted to argue reasonable

inferences from the evidence that has been submitted). Because there was undisputed evidence that Clarke knew of Plummer's intent to take the wallet, moreover, the identity of the robber was immaterial because Clarke aided and abetted Plummer's commission of the robbery. Accordingly, the court of appeals reasonably concluded that the statement was not prejudicial.

**B.**

We turn next to the prosecutor's purported misrepresentations of the applicable law. Egregious prosecutorial misrepresentations of the elements of a crime during closing argument may mislead the jurors and contaminate the verdict, but "arguments of counsel generally carry less weight with a jury than do instructions from the court," and prosecutorial misrepresentations "are not to be judged as having the same force as an instruction from the court." *Boyde v. California*, 494 U.S. 370, 384–85 (1990). Arguments of counsel "are usually billed in advance to the jury as matters of argument, not evidence, . . . and are likely viewed as the statements of advocates." *Id.* at 384. The court's instructions, on the other hand, "are viewed as definitive and binding statements of the law." *Id.* "And the arguments of counsel, like the instructions of the court, must be judged in the context in which they are made." *Id.* at 385.

During his summation, the prosecutor made repeated references to the felony murder *mens rea* requirement, many of which were inaccurate. At one point he stated:

> It doesn't matter who actually shot, or who had the gun. It's the intent. Everybody went into that house with the same intent. They were wearing the clothes. They both know they had the gun. They both go in there. They want to rob. And they have a plan.

He later stated:

> Felony murder only requires this defendant helped cause the death of Kim Crider, and/or John Crider. Okay. Defendant knowingly helped create a very high risk for death—of death or great bodily harm knowing that the death, or such harm would be the likely result of his, or her actions. If she goes in there, and creates a dangerous situation, in the course of a robbery, which is the third one, when she helped in the act, that caused the death of Kim Crider, and/or John Crider, defendant was committing, or attempting to commit, or helping someone else commit the crime of robbery. Felony murder. . . . [S]he is certainly guilty of felony murder, because of going in, and committing a robbery, and causing a death. And her intent was to kill, but certainly just by causing the robbery, in and out of itself, it is such a dangerous thing in the middle of the night, with a gun, that that is a felony murder, classic felony murder.

The prosecutor also stated during rebuttal:

> But that['s] all that's required that I prove to you, for felony murder, is that she robbed somebody, created a dangerous situation, and that caused the death. That's all I have to prove. And to suggest that felony murder requires that I have to say that she woke up and wanted to murder somebody, or that and at anytime, she had the intent to murder, is absolutely wrong.

The Michigan Court of Appeals concluded that "the prosecutor's statements were not a clear misstatement of the law, and any suspect articulation was corrected by the judge's instructions to the jury. The judge properly instructed the jury on the elements of felony murder." *Clarke*, 2003 WL 22138022, at *5. At least the first portion of that conclusion was based on an unreasonable determination of the facts with respect to the applicable law. The prosecutor's exposition of the elements of felony murder wrote the *mens rea* requirement out of the statute. On at least three separate occasions, he stated that Clarke was guilty of felony murder if she created a dangerous situation in the course of committing a robbery. The statute, in contrast, requires the prosecution to prove more than just the creation of a dangerous situation. It requires the state to prove either (i) intent to cause death or great bodily harm or (ii) knowledge that death or great bodily harm was

likely to result. *See Riley*, 659 N.W.2d at 614. The prosecutor's statements, which minimized the significance of the women's mindset at the time of the shootings, therefore were inadequate, inaccurate, and improper.

Yet the mere fact of the misrepresentations is insufficient to establish a right to *habeas* relief. The misstatements run afoul of the Constitution only if there is a "reasonable likelihood" that the prosecutor's misstatements caused the jury to convict Clarke of felony murder without first concluding, beyond a reasonable doubt, that she possessed the requisite *mens rea*. *See Waddington v. Sarausad*, 555 U.S. 179, 191 (2009). In conducting this inquiry, we must consider the statements in context rather than in isolation. *Boyde*, 494 U.S. at 385.

The prosecutor's misstatements were unlikely to affect the jurors' deliberations. As the Court emphasized in *Boyde*, the closing arguments of counsel were billed to the jurors as arguments rather than evidence, and the jurors were told that the court's explanation of the law was dispositive. During its instructions, moreover, the trial court put great emphasis on the *mens rea* requirement and explained the elements of felony murder to the jurors. Those instructions were given *after* the closing arguments. The court therefore mitigated any confusion that the prosecutor had caused, and there is not a reasonable likelihood that the prosecutor's statements caused the jurors to disregard the *mens rea* requirement.

In sum, the prosecutor's omission of the felony murder *mens rea* requirement was constitutionally unsound. Because Clarke cannot show a reasonable likelihood that the prosecutor's improper statements relieved the state of its burden to prove Clarke's *mens rea* beyond a reasonable doubt, however, *habeas* relief is not warranted. *See Sarausad*, 555 U.S. at 193–94.

**C.**

Clarke takes exception to comments that the prosecutor made with respect to the victims' injuries and the waning moments of their lives. "Generally, 'a prosecutor cannot make statements calculated to incite the passions and prejudices of the jurors.'" *Wogenstahl v. Mitchell*, 668 F.3d 307, 333 (6th Cir. 2012) (quoting *Broom v. Mitchell*, 441 F.3d 392, 412 (6th Cir. 2006)). "[A] prosecutor illicitly incites the passions and prejudices of the jury when he calls on the jury's emotions and fears—rather than the evidence—to decide the case." *Johnson v. Bell*, 525 F.3d 466, 484 (6th Cir. 2008). "Closing arguments that encourage juror identification with crime victims are improper" as well. *Id.* Yet "nothing prevents the government from appealing to the jurors' sense of justice or from connecting the point to the victims of the case." *Wogenstahl*, 668 F.3d at 333 (internal quotation marks and alternations omitted).

Clarke challenges the prosecutor's descriptions of the victims' injuries. First describing Kim Crider's injuries, the prosecutor stated:

> You heard the testimony of the medical examiner. Dr. Land. He was shot. He was shot through the lung. He was shot through the lung, and it lodged in his spine. And if he had lived, he would have been a quadriplegic. He was shot through the liver. Within minutes, death. Matt Simpson came in. There was moaning, gurgling. Could you get response out of him, did he say anything? No.

The prosecutor's description of John Crider's injuries was similar:

> He hung in there for almost two weeks. Dr. Krznarich told you what happened to him. All of the suffering. Everything else that he endured. Three different surgeries to his abdomen trying to repair the damage. They in[t]ubated. They stuck a tube down his—down his wind pipe, and they put [him] on a ventilator to try to keep him alive. They put a colostomy bag on him. He hung in there. He hung in there.

The Michigan Court of Appeals held that "the prosecutor permissibly commented on the evidence and accurately described the heinous nature of the shootings in this murder trial. Moreover, the prosecutor did not ask the jury to suspend their judgment and decide the case on the basis of sympathy. The prosecutor was not required to phrase his arguments in the blandest of all possible terms." *Clarke*, 2003 WL 22138022, at *5 (internal citation and quotation marks omitted).

The state court's decision was a reasonable interpretation of the facts, and Clarke has not identified inconsistent Supreme Court precedent. To be sure, the prosecutor's comments approached the demarcation line that divides appropriately evocative recapitulations of the evidence from vulgar attempts to manipulate and exploit the jurors' passions and sympathies. But the comments did not cross that line. Although the prosecutor's remarks reminded the jurors of the gravity of the crimes of which Clarke stood accused, he did not call on the jurors to sympathize for the victims, and his descriptions of the victims' injuries were grounded in the evidence. *Cf. United States v. Boyd*, 640 F.3d 657, 670 (6th Cir. 2011) (prohibiting remarks such as "it could have been you" and comments implying that if the jurors "do not convict, a crime wave or some other calamity will consume their community" (internal quotation marks omitted)); *Smith v. Jones*, 326 F. App'x 324, 332 (6th Cir. 2009) (stating that the prosecutor inappropriately appealed to the jurors' emotions when he "plac[ed] in the jurors' minds the thought of their own daughters being stopped by a police officer accused of committing a sexual crime"). Murder trials tend to involve grisly facts, and although prosecutors may not exploit the disquieting nature of those facts for verboten ends, prosecutors have no affirmative obligation to conceal or shy away from those facts. *See Byrd*, 209 F.3d at 532.

**D.**

Clarke also contends that the prosecutor denigrated both her and her trial counsel during closing arguments. "It is improper to personally attack defense counsel or argue that counsel is attempting to mislead the jury." *West v. Bell*, 550 F.3d 542, 565 (6th Cir. 2008). Neither the prosecutor nor defense counsel is permitted to "interject[] personal beliefs into the presentation of his case" or "make unfounded and inflammatory attacks on the opposing advocate." *United States v. Young*, 470 U.S. 1, 8–9 (1985). And "in all events the prosecutor may not simply belittle" the defendant, defense counsel, or defense witnesses. *Bedford v. Collins*, 567 F.3d 225, 233 (6th Cir. 2009). But the prosecution also "has 'wide latitude' during closing argument to respond to the defense's strategies, evidence and arguments." *Id.* (quoting *United States v. Henry*, 545 F.3d 367, 377 (6th Cir. 2008)). "How far the government may go . . . depends on what the defense has said or done (or likely will say or do)." *Id.*

During his closing argument, defense counsel attempted to diminish the significance of the decision by Clarke and Plummer to change into black clothing:

> [I]n about three hours I will be wearing black, because I will be at the Grand Blanc football game. We got a juror right here in black. Here's black. Big deal. Black is kind of the color[] that is [in] Vogue now. Couple years ago, it was teal. Now everybody wants black. Because it is night, snow on the ground, black clothes.

The prosecutor responded to this argument in his rebuttal:

> He wants to tell you, oh, well, this juror is wearing black, and I'm going to be wearing black in a couple hours. Okay. But let's look again at what was actually said here by his client about that. Page 16, about the black. Okay. Was she going to watch a football game? I don't think so.

The prosecutor then read aloud the transcript of Clarke's conversation with the officers after her arrest, and he continued: "That's what she says. That's not what [defense counsel] says now. Football games, fashion statements. That's just—that's outrageous. That's outrageous." Moments later he returned to the same subject:

> [Defense counsel] must have the hardest job in the world right now, because the only thing that he has to say is two weeks before the crime, brutally, deadly, calculating and coldly murdered two people that were innocent of nothing other than showing hospitality, that . . . that assault [of Clarke by the abusive drug dealer] is somehow relevant. That's all he said. The rest of it is just fashion statements and football games. That's just outrageous.

Defense counsel then objected, stating, "I don't think that['s] what I said at all," and the court laconically answered, "The jury will decide."

The Michigan Court of Appeals concluded that "the prosecutor was merely rebutting defense counsel's arguments. Such a rebuttal is not misconduct, and he is not required to phrase his arguments in the blandest of all possible terms. Since the prosecutor did not denigrate the credibility of defense counsel, or suggest that defense counsel was intentionally trying to mislead the jury, we find the prosecutor's comments proper." *Clarke*, 2003 WL 22138022, at *6.

The state court's analysis was both consistent with and a reasonable application of *Young*, 470 U.S. at 9, which prohibits *personal attacks* directed against opposing counsel.[4] The prosecutor neither attacked nor belittled Clarke's attorney; he argued that Clarke's proffered defense was

---

[4]Although the state court did not address whether the prosecutor's statements comported with *Young*, the *habeas* court's obligation is to "determine what arguments or theories supported or . . . could have supported[] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Richter*, 131 S. Ct. at 786.

"outrageous." He was entitled to "wide latitude" to respond to defense counsel's arguments, *see*

*Bedford*, 567 F.3d at 233, and he did not exceed the scope of that latitude.

**IV.**

Clarke's next array of claims pertains to the trial court's jury instructions. She argues that

the trial court infringed her right to a fair trial because it issued "inaccurate, confusing, or incomplete

jury instructions" on the *mens rea* required for a felony-murder conviction and on the elements of

armed robbery and second-degree murder.[5]

When reviewing jury instructions on *habeas* review, we ask whether the instruction was

erroneous and, if so, whether the instruction "so infected the entire trial that the resulting conviction

violates due process." *Cupp v. Naughten*, 414 U.S. 141, 147 (1973). Put another way, a *habeas*

petitioner is not entitled to relief unless the error "had a substantial and injurious effect or influence

in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (internal

quotation marks omitted). "[T]he defendant must show both that the instruction was ambiguous and

that there was a reasonable likelihood that the jury applied the instruction in a way that relieved the

State of its burden of proving every element of the crime beyond a reasonable doubt." *Sarausad*,

555 U.S. at 190–91 (internal quotation marks omitted).

---

[5]This court's certificate of appealability also permitted Clarke to appeal the instructions regarding aiding and abetting, but Clarke now concedes that there is "no viable basis for a claim on that issue." Clarke therefore waives her right to appeal those instructions. (Brief at 17 n.5.)

**A.**

"The elements of armed robbery are: (1) an assault and (2) a felonious taking of property from the victim's presence or person (3) while the defendant is armed with a weapon." *People v. Smith*, 733 N.W. 2d 351, 365 (Mich. 2007). "Armed robbery is a specific intent crime for which the prosecutor must establish that the defendant intended to permanently deprive the owner of property." *People v. King*, 534 N.W.2d 534, 536 (Mich. Ct. App. 1995).

Clarke argued on appeal that the trial court failed to instruct the jury on the intent-to-deprive element of armed robbery—an essential element of the offense. The state court of appeals rejected that argument, holding that "the element that defendant had to have intended to permanently deprive the victims of their money was in fact related to the jury." *Clarke*, 2003 WL 22138022, at *7. Yet the record does not corroborate that conclusion: The trial transcript is devoid of evidence that the jurors received instruction on that element of the offense, and the warden makes no argument to the contrary. The court of appeals therefore made an unreasonable determination of the facts, in violation of 28 U.S.C. § 2254(d)(2), and the trial court's armed robbery instruction was deficient.

Notwithstanding the conspicuousness of the trial court's error, "an instruction that omits an element of the offense does not *necessarily* render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." *Neder v. United States*, 527 U.S. 1, 9 (1999). The error must be considered harmless "unless it had a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Murr v. United States*, 200 F.3d 895, 906 (6th Cir. 2000) (quoting *Brecht*, 507 U.S. at 637). In other words, we must determine "whether it appears 'beyond

a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Neder*, 527 U.S. at 15 (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)).

Our review for prejudice is made somewhat more difficult because we cannot be certain whether the jurors determined Clarke to be the robber or the accomplice. Ultimately, though, that decision is inconsequential. In the event the jurors determined Clarke to be the robber, the sole effect of the trial court's failure to provide the intent-to-deprive instruction was to relieve the jurors of their obligation to ascertain whether, at the time Clarke perpetrated these acts, she intended to return the money. No reasonable juror could conclude that Clarke committed these crimes with the intent to return the wallet's contents to the victims or their estates on some later date. Clarke does not press that argument upon us, nor is there evidence in the record to support it. *See Patterson v. Haskins*, 316 F.3d 596, 610 (6th Cir. 2003) (stating that an erroneous instruction is harmless if "'the omitted element was uncontested and supported by overwhelming evidence'" (quoting *Neder*, 527 U.S. at 17)). Accordingly, if the jurors found Clarke to be the robber, her intent permanently to deprive the victims of their money was neither contested nor contestable, and the trial court's omission of that element from the instructions had no "substantial and injurious effect or influence in determining the jury's verdict." *See Brecht*, 507 U.S. at 637.

If, as the state court concluded,[6] Clarke was the accomplice rather than the robber, she could be convicted as an aider and abettor if (1) Plummer committed armed robbery with the intent permanently to deprive the victims of their money, and (2) Clarke participated in the robbery with

---

[6]The state court's factual determination is presumptively correct on *habeas* review. *See* 28 U.S.C. § 2254(e)(1).

knowledge of Plummer's intent.  *See People v. Robinson*, 715 N.W.2d 44, 48 (Mich. 2006).

Because the trial court failed to instruct on the element of intent, the question for us is twofold:  Did

Plummer have the requisite intent, and did Clarke know of Plummer's intent at the time Clarke

participated in the robbery?

Uncontroverted evidence requires us to answer both questions in the affirmative.  The record

evidence indisputably establishes that Clarke participated in the robbery when she furnished her

handgun to Plummer.[7]  Clarke does not dispute Plummer's intent at that time, nor could she.  The

trial transcript is rife with testimony of Plummer's intent to rob the victims.  That intent was present

when the two women arrived at the house, and it did not dissipate during their bathroom

conversation, when Clarke purportedly expressed second thoughts about their criminal undertaking.

Plummer reaffirmed the plan while the women were sequestered in the bathroom; there is no

evidence that Plummer ever second-guessed her decision to rob Kim and John Crider.

There is also uncontroverted evidence that Clarke knew of Plummer's intent at the time she

provided Plummer with the handgun.  Clarke told Elford that their plan when leaving the bathroom

was "to go in and shoot them, and then take whatever they could."  Clarke admitted that the two

women intended to rob Kim and John Crider when they exited the bathroom, and when Elford asked

---

[7]Clarke steers us toward evidence that she abandoned or withdrew from the plan upon her arrival at the Criders' house.  Yet, we have no authority to review the record to determine whether Clarke participated in the robbery.  That is the province of the jurors, whose verdict reflects their rejection of her position.  Clarke's *habeas* petition does not challenge the sufficiency of the evidence, and we must accept the jurors' determination that she participated in the robbery.  Our inquiry here is much more circumscribed.  We consider only the perpetrators' states of mind—Plummer's intent and Clarke's knowledge.

why the women committed the robbery, Clarke stated that they needed the money. Clarke's counsel even tried to get Elford to acknowledge that Clarke's plan when leaving the bathroom was to rob the men but not shoot them. Clarke has identified no evidence suggesting her ignorance of Plummer's intent, and these uncontroverted facts conclusively establish Clarke's guilt as an aider and abettor. *See Riley*, 659 N.W.2d at 614.

Accordingly, the trial court's failure to instruct on the intent-to-deprive element of armed robbery, though erroneous, was harmless error because there was not a "reasonable likelihood" that the jury would have acquitted Clarke if it had been instructed on the intent-to-deprive element. *See Sarausad*, 555 U.S. at 191.

**B.**

Clarke next claims the court "provided the jury with a hopelessly confusing and internally inconsistent set of instructions regarding the *mens rea* necessary for a felony murder conviction." When instructing the jury on the elements of first-degree felony murder, the trial court stated:

> [I]t must be proven to you that this defendant had one of these three states of mind. . . . They have to prove that she either intended to kill, or she intended to do great bodily harm to either of the Crider brothers, or she knowingly created a very high risk of death, or great bodily harm knowing that death, or such harm would be the likely result of her actions. I will say that again, because there are alternatives here. The second element that has to be proven is, that the defendant had one of these three states of mind. Either that she intended to kill, or she intended to do great bodily harm, or she knowingly created a very high risk of death, or great bodily harm knowing that death, or such harm would be the likely result of her actions.

About fifteen minutes later, after explaining the elements of each crime charged, the trial court attempted to explain the concept of specific intent:

> The specific intent thing I was going to tell you about, means that on some kind of charges, you have to show that the defendant had a specific intent to do the specific crime. And that means that the prosecution must prove not only that the defendant did certain acts, sometimes you can do an act without intent, but that she did the acts with the intent to cause a particular result. So, for the crime of felony murder, the prosecutor must show that she intended to kill, or she intended to commit armed robbery.

Counsel then requested a brief bench conference, after which the court again sought to clarify the issue of specific intent:

> Let me go back to that specific intent. Remember I talked about there are various states of mind that have to be shown. In the felony murder they [have to] prove that she specifically intended to kill, or knowingly created a very high risk of death, or great bodily harm, or—I didn't get it all. Yes, I did.

Clarke argues that the second instruction led the jurors to believe that intent to commit armed robbery would be sufficient to establish the requisite *mens rea*, and she argues that the trial court's failure to instruct the jurors to disregard the second instruction "le[ft] the jury free to conclude erroneously that intent to commit armed robbery was a sufficient *mens rea* for felony murder." But the Supreme Court rejected this argument in *Cupp v. Naughten*. *See* 414 U.S. at 146–47. "[T]he question is not whether the trial court failed to isolate and cure a particular ailing instruction, but rather whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id.* at 147; *see also Longwell v. Arnold*, 371 F. App'x 582, 587–88 (6th Cir. 2010).[8]

---

[8]Clarke claims that the "longstanding rule in Michigan—implicit in the concept of due process—is that '[w]here two instructions are given[,] one proper and one improper[,] it is presumed that the jury followed the erroneous one.'" (Clarke's Brief at 24 n.8 (quoting *People v. Pace*, 302 N.W.2d 216, 221 (Mich. Ct. App. 1980)) (alterations in original).) A petitioner's entitlement to *habeas* relief, however, must come from federal rather than state law. *See Daniels v. Lafler*, 501

The trial court twice gave the correct *mens rea* instruction: once when explaining the elements of the crime, and again—immediately after the misstated instruction—when clarifying the concept of specific intent. It cannot be said that "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *See Naughten*, 414 U.S. at 147. That the parties convened at the bench immediately after the misstated instruction, and that the court then restated the specific-intent requirement for felony murder, would lead a reasonable juror to conclude that the court was correcting or clarifying its prior instruction. And even if the jurors did not recognize that the court was correcting its prior misstatement, the court provided a lucid explanation of the *mens rea* requirement when delineating the elements of the crime. *See Daniels v. Lafler*, 501 F.3d 735, 742 (6th Cir. 2007) (rejecting *habeas* relief for erroneous instruction where "earlier in its instruction, the trial court accurately stated the *mens rea* requirement twice").

## C.

According to Clarke, the trial court incorrectly instructed the jurors on the elements of second-degree murder, which is a lesser-included offense of felony murder, because the court stated that second-degree murder is a specific-intent crime. Second-degree murder is, in fact, a general-intent rather than specific-intent crime, *see People v. Langworthy*, 331 N.W.2d 171, 177–80 (Mich. 1982), and there is no dispute that the trial court inaccurately described second-degree murder as a specific-intent crime at one point. The sole question presented for our review is whether the state

---

F.3d 735, 741 (6th Cir. 2007). The Michigan rule therefore does not control the disposition of the constitutional question presented here.

court of appeals erred when it determined that Clarke suffered no prejudice attributable to the misstatement. For two reasons, it did not.

First, although the Michigan Court of Appeals agreed with Clarke's characterization of felony murder as a general-intent crime, that court determined that "the trial court properly instructed the jury on the elements and requisite intent of the charged offenses." *Clarke*, 2003 WL 22138022, at *7. As Clarke admits, that is true; the trial court correctly recited the elements of second-degree murder earlier in the instructions. The state court's conclusion therefore was based on a reasonable determination of the facts.

Second, the state court of appeals reasonably concluded that the misstatement did not prejudice Clarke. The trial court described second-degree murder as a specific-intent crime only in passing, and the court actually stopped in the middle of its sentence without explaining to the jurors what that meant. It is therefore unlikely that the jurors understood second-degree murder to be a specific-intent crime. *See Boyde*, 494 U.S. at 380–81 ("Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.").

Even if the jurors believed that second-degree murder was a specific-intent crime, moreover, Clarke has not explained how that would cause her prejudice. A specific-intent requirement places a higher burden on the prosecution than the law requires, and Clarke cannot protest an instruction that required more proof of culpability than the statute required. Clarke therefore is unable to

establish that the trial court's misstatement was prejudicial, and the state court's application of the law was reasonable.

## V.

Clarke's final claims relate to the performance of her trial counsel. She maintains that counsel was constitutionally ineffective because (1) he neglected to procure evidence that she suffered from post-traumatic stress disorder and failed to present that evidence at sentencing, (2) he did not object to the prosecutor's misrepresentations of the evidence and the law, and (3) he never moved to suppress the admission of her statement to the police.

To establish ineffective assistance of counsel, a defendant must show that trial counsel's performance was deficient—*i.e.*, that the representation fell below an objective standard of reasonableness—and that the defendant suffered prejudice as a result of the deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687–92 (1984). And to establish a right to *habeas* relief due to ineffective counsel, the defendant must establish that the state court's application of the *Strickland* standard was unreasonable. *See* § 2254(d)(1). "The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 131 S. Ct. at 788 (internal citations and quotations marks omitted). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*[9]

[9]The state courts never considered the first two of these three ineffective-assistance claims. On direct appeal, the state court of appeals considered only whether trial counsel was ineffective for failing to object to the trial court's instructions—a claim that is not before this court. When she moved for relief from the judgment, Clarke argued that trial counsel was ineffective because he did

**A.**

Clarke first contends that her trial counsel was constitutionally ineffective because he failed to arrange for a forensic examination of Clarke and failed to present evidence of post-traumatic stress disorder (PTSD) at Clarke's sentencing hearing.

According to an affidavit that Clarke submitted to the federal district court, two weeks before the shootings she was kidnaped by David Smith. He interrogated and tortured her and pummeled her with a lead pipe. He also burned off most of her hair with a cigarette lighter. Three days later, Smith and several accomplices beat Clarke again and threatened to kill her family. The incident resulted in her hospitalization and led her to self-medicate in the days leading up to the shootings. Clarke asserts that she suffered substantial pain and psychological trauma as a result of the assault, and she submitted an April 2008 report from the prison medical staff noting that she has PTSD.

We need not consider whether counsel's decision not to present evidence of PTSD at sentencing constituted deficient performance because Clarke is unable to show prejudice as a result of counsel's alleged neglect. Counsel's failure to present evidence of PTSD at sentencing is prejudicial only if there is a reasonable probability that presentation of the evidence would have resulted in a lesser sentence. *See Wiggins v. Smith*, 539 U.S. 510, 536 (2003). Although the trial court did not view or receive evidence that Clarke suffered from PTSD, the court was aware of the trauma inflicted during the assaults. The jurors and the court saw considerable evidence of the

not move to suppress her statement to the police. Because the state court rejected this claim on the merits, the deferential *Richter* standard applies to our review of that claim. But the state courts never adjudicated the other two claims on the merits. The warden does not argue that Clarke procedurally defaulted on these claims, so we apply the *Strickland* standard to these claims *de novo*.

assaults; in his closing argument, defense counsel stated that the jurors heard about the assaults

"from probably every witness." The trial court thus knew of the trauma, and Clarke has not

established a reasonable probability that the court would have imposed a lesser sentence had the

court seen evidence that the trauma caused PTSD.[10]

**B.**

Clarke also seeks *habeas* relief on the basis of her trial counsel's failure to object when the

prosecutor misrepresented the evidence and the law. As explained above, however, the prosecutor's

misstatements did not infect the trial with unfairness, and Clarke cannot establish that the

misstatements caused prejudice.

In most instances, counsel's failure to object to the comments was immaterial because the

comments themselves were innocuous. Whether Clarke personally pulled the trigger or lifted the

wallet was inconsequential, for example, because there was ample undisputed evidence establishing

Clarke's guilt as an aider and abettor. The other two misstatements of the evidence were trivial and

wholly unrelated to the merits of the case. Neither Clarke's alleged emotional manipulation of her

cousin nor the "last words" that emanated from John Crider's mouth reasonably could have served

as the basis for any juror's vote of conviction. And with respect to the prosecutor's purported

---

[10]Indeed, Clarke has not submitted reliable evidence that she suffered from PTSD at the time of these crimes. The April 2008 prison report states that Clarke was afflicted with PTSD at that time, but the provenance of that diagnosis is conspicuously absent. We recognize the substantial encumbrance and potential unfairness that would be created if conclusive evidence of PTSD were required for Clarke to establish a viable ineffective-assistance claim, and we do not dispose of her claim on that ground. But Clarke's claim is no doubt weakened due to the want of a proper diagnosis.

appeals to the jurors' emotions, those remarks were not impermissible, and counsel's objection likely would have been overruled.

The misstatements of the law were more significant, but these remarks did not cause prejudice for the reasons stated in section III.B. There is not a reasonable probability that the comments affected the jurors' deliberations because the trial court correctly instructed the jurors on the applicable law. There was ample evidence that Clarke possessed the requisite *mens rea*, moreover, and Clarke cannot establish a reasonable probability that the result of the trial would have been different had her attorney objected to the prosecutor's mischaracterization of the *mens rea* requirement. *See Strickland*, 466 U.S. at 694. Accordingly, neither the prosecutor's comments nor Clarke's attorney's failure to object to those comments caused her to be prejudiced.

## C.

In her final claim, Clarke argues that her trial counsel was ineffective because he did not move to suppress her post-arrest statement to the police. That statement was a focal point throughout the trial, and if it was inadmissible, counsel's failure to object doubtless would have been prejudicial. But we conclude that the statement was admissible, and Clarke's claim therefore lacks merit.

Clarke first contends that the statement was inadmissible because she "was in no mental or physical condition to provide a reliable statement when she was interrogated." The district court properly rejected this argument, noting that the tape-recorded interview lasted just seventy-two minutes and that the "detailed and coherent account that Petitioner gave of the events before, during, and after the shooting supports the conclusion that Petitioner was not incapacitated by drugs or

stress." *Clarke*, 2011 WL 2580686, at *19. Just nineteen minutes after Clarke's initial conversation with the officers, she asked to speak with them again to provide additional information. And there is nothing in the record indicating that the information she provided in the statement was incorrect or unreliable.

Clarke also argues that her statement was coerced because Detective Elford, her interrogator, was responsible for the investigation of her earlier assault and threatened to jettison that investigation unless she provided him with a statement. In an affidavit attached to her federal *habeas* petition, Clarke wrote:

> Detective Elford told me that I was a suspect in a murder investigation[,] and when he told me I was not walking out of the room unless I gave him a statement[,] I asked to use the phone to call my parents to get an attorney. Detective Elford stated, "You['re] not calling anyone until you give me a statement, you will not walk out of this room until you give me a statement. I was horrified . . . .

She wrote that Elford's tone and demeanor later changed and that he promised leniency if she answered his questions. His colleague then walked in, she said, and the tape recorder was turned on.

Clarke's 2008 affidavit is the only evidence that Elford rejected her effort to contact her parents before providing the statement. Her tape-recorded statement includes no request for an attorney, and she signed the *Miranda* form waiving her right to counsel. When the state court denied Clarke's motion for relief from the judgment, the court concluded that Clarke's statement was voluntary and that Clarke had not established a reasonable probability that, but for counsel's failure to move for suppression of the statement, the result of her trial would have been different. That conclusion was consistent with the Supreme Court's voluntariness jurisprudence, *see Colorado v.*

-31-

*Connelly*, 479 U.S. 157, 163–67 (1986), and the state court's denial of the ineffective-assistance claim is especially reasonable when viewed through the doubly deferential prism of AEDPA and *Strickland*, *see Richter*, 131 S. Ct. at 788.

## VI.

We affirm the district court's denial of Clarke's petition for a writ of *habeas corpus*.